Page 1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
2                    ATLANTA DIVISION

3

   STEVEN LOWE,

4
                Plaintiff,

5
   vs.                          CIVIL ACTION FILE
6                               NO. 1:20-cv-05224-CAP
   DIFEI TRANSPORT, LLC and
7  ARMAS ARMELIO,

8               Defendants.

9

    RULE 30(b)(6) VIDEO DEPOSITION OF SPINE CENTER
10       ATLANTA, LLC, by Witness Daniel Lincoln
               Taken by Remote Conference
11               September 16, 2021
                     2:04 p.m.

12

           Valerie N. Almand, RPR, CRR, CRC
13       Jonathan Miller, Legal Video Specialist

14

15

16

17

18

19

20

21

22

23

24

25

30(b)(6) Daniel Lincoln                    September 16, 2021
Lowe, Steven v. Difei Transport LLC

Page 2

1                       INDEX OF EXHIBITS

2    PLAINTIFF'S

3    EXHIBIT              DESCRIPTION              PAGE

4    Exhibit P1      SCA Patient Ledger          85

5    DEFENDANTS'

6    EXHIBIT

7    Exhibit 1      SCA records for              46

8                   Mr. Lowe

9    Exhibit 2      Cigna Provider Profile       90

10                  Page for Brian Adams, MD

11

        **Defendant Exhibits retained by counsel**

12

13                     INDEX OF EXAMINATION

14   By Mr. Sessions                        Page 6

15   By Mr. McEvoy                          Page 84

16

17

18

19

20

21

22

23

24

25

Page 3

```
 1   APPEARANCES OF COUNSEL:

 2   On behalf of the Plaintiff:

 3           R. SEAN McEVOY, Esquire

 4           KINGSLEY EWENIKE, Esquire

 5               (for time noted)

 6           Witherite Law Group, LLC

 7           600 West Peachtree Street, NW

 8           Suite 740

 9           Atlanta, Georgia  30308

10           800.878.2597

11   On behalf of the Defendants:

12           MATTHEW R. SESSIONS, Esquire

13           McMickle, Kurey & Branch, L.L.P.

14           217 Roswell Street

15           Suite 200

16           Alpharetta, Georgia  30009

17           678.824.7800

18   On behalf of Spine Center Atlanta, LLC and the

19   Witness:

20           KASSANDRA LAWSON, Esquire

21           Hulsey, Oliver & Mahar, LLP

22           P.O. Box 1457

23           200 E.E. Butler Parkway

24           Gainesville, Georgia  30503

25           770.532.6312
```

30(b)(6) Daniel Lincoln                    September 16, 2021
Lowe, Steven v. Difei Transport LLC

                                                    Page 4

1    Legal Video Specialist:   Jonathan Miller

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1          THE VIDEOGRAPHER:  We are on the record,

2    September 16th, 2021 at approximately 2:04 p.m.

3    Eastern Time.  This will be the 30(b)(6)

4    videotaped deposition of Spine Center Atlanta,

5    LLC.  Corporate representative today will be

6    Daniel Lincoln.

7          Counsel will identify themselves and who

8    they represent for the record.

9          MR. McEVOY:  Sean McEvoy for the

10   plaintiff.

11         MR. SESSIONS:  Matt Sessions on behalf of

12   defendants.

13         THE VIDEOGRAPHER:  Will the court

14   reporter please swear the witness.

15         MS. LAWSON:  Kas Lawson --

16         THE VIDEOGRAPHER:  Oh, I apologize.

17         MS. LAWSON:  That's fine -- Spine Center

18   Atlanta attorney here, Kassandra Lawson.

19         THE VIDEOGRAPHER:  Will the court

20   reporter please swear the witness.

21         THE STENOGRAPHER:  Due to the need for

22   this deposition to take place remotely because of

23   the Government's order for social distancing, the

24   parties will stipulate that the court reporter may

25   swear in the witness over Veritext virtual

Page 6

1    videoconference and that the witness has verified

2    that he is, in fact, Daniel Lincoln.

3                      DANIEL LINCOLN,

4    having been duly sworn, was examined and testified

5    as follows:

6               MR. SESSIONS:  This is the deposition of

7    Spine Center Atlanta taken by agreement of counsel

8    with all formalities waived, taken on behalf of

9    defendants, as opposite party for purposes of

10   discovery, cross-examination, and all other

11   purposes allowed under the Federal Rules of Civil

12   Procedure.

13              I propose that all objections be

14   reserved -- and -- objections as to the form of

15   the question and responsiveness of the answer be

16   reserved until time of trial or further use of the

17   deposition.  Is that agreeable?

18              MR. McEVOY:  Yeah, that's fine.  I don't

19   think he's an opposite party to you, though.

20              MR. SESSIONS:  True, true.  Okay.

21                      EXAMINATION

22   BY MR. SESSIONS:

23      Q.  Mr. Lincoln, good afternoon, my name is

24   Matt Sessions.  I'm here today to take the

25   deposition of Spine Center Atlanta.  It's my

30(b)(6) Daniel Lincoln                    September 16, 2021
Lowe, Steven v. Difei Transport LLC

Page 7

1   understanding that you've been designated as its

2   corporate representative, is that true?

3           A.   That is.

4           Q.   Okay.  Have you reviewed all the topics

5   listed on the deposition notice for Spine Center

6   Atlanta?

7           A.   I have.

8           Q.   And are you competent to give answers on

9   all of those subjects?

10          A.   I am.

11          Q.   Will you please provide your role in the

12  company.

13          A.   I work in practice management, so

14  operations and business management for the Spine

15  Center Atlanta.

16          Q.   And how long have you been in that role

17  with the company?

18          A.   Just under two years.

19          Q.   Did you have any -- have you had other

20  roles with Spine Center or has that been your only

21  job title while you've been employed there?

22          A.   My only job title.

23          Q.   Okay.  So you've been with Spine Center

24  for about two years?

25          A.   Yeah, just under two years.

Page 8

1      Q.  And you understand today that you are not

2   speaking as an individual, you're speaking on

3   behalf of Spine Center Atlanta and everything that

4   you say binds Spine Center Atlanta?

5      A.  I understand.

6      Q.  And you understand that you're under oath

7   and you have agreed to give truthful answers

8   today?

9      A.  I do.

10     Q.  Have you given prior depositions as a

11  corporate representative for Spine Center Atlanta?

12     A.  I have.

13     Q.  Approximately how many prior depositions

14  have you done on behalf of Spine Center?

15     A.  I think four or five.

16     Q.  All right.  Let's jump right in.  I'd

17  like to start by talking about the referral of the

18  plaintiff in this case, Steven Lowe, to Spine

19  Center Atlanta.  Do you have an understanding of

20  how he was referred to Spine Center initially?

21     A.  I believe through the Witherite Law

22  Group.

23     Q.  So Spine Center Atlanta was first

24  contacted by the Witherite Law Group in regards to

25  Mr. Lowe becoming a patient?

Page 9

```
 1        A.  Yes, as far as I know.  Is there a
 2   document that you want me to follow along with, or
 3   just -- because some of this would be by memory or
 4   what I've reviewed, but it might be helpful just
 5   so I can confirm correctly.
 6        Q.  Absolutely.  So I'm going to share screen
 7   with you now and I'm going to -- tell me if you
 8   can -- can you see my screen?
 9        A.  Yes, I can.
10        Q.  Okay.  I want to start with what is SCA
11   number 18.  Can you see this?
12        A.  Yes, I can.
13        Q.  Okay.  Do you recognize this document?
14        A.  Yes, I do.
15        Q.  Tell me what we're looking at.
16        A.  This is an email from one of our
17   employees in regard to the referral of Mr. Lowe.
18        Q.  Okay.  So this is an email from Michael
19   Glantz?
20        A.  Correct.
21        Q.  And Michael Glantz is an employee of
22   Spine Center Atlanta?
23        A.  Yes, he is.
24        Q.  What is his job title or role?
25        A.  He's a physician liaison.
```

30(b)(6) Daniel Lincoln                   September 16, 2021
Lowe, Steven v. Difei Transport LLC

Page 10

1      Q.   And what does a physician liaison do for

2   Spine Center Atlanta?

3      A.   They are a -- they facilitate the process

4   of patients that are being referred into the

5   practice to ensure that they're referred into the

6   appropriate area and that they can be taken care

7   of appropriately.  So it's a liaison role where

8   they're directing to ensure that patients are

9   cared for appropriately.

10     Q.   And approximately how many physician

11  liaisons does Spine Center Atlanta employ?

12     A.   Four.

13     Q.   So in this case Mr. Glantz was I guess

14  kind of shepherding or being an intermediary for a

15  referral from the Witherite firm.  Are your

16  liaisons assigned to specific firms, or do they

17  kind of rotate in between different clients?  How

18  does that work?

19     A.   They do rotate, but they will cover --

20  it's based on geography, so they will cover a

21  certain geography, if you will, and there has been

22  rotation from time to time.

23     Q.   So at the time of this email in June of

24  2019 was Mr. Glantz the only physician liaison

25  assigned to the Witherite firm?

30(b)(6) Daniel Lincoln                September 16, 2021
Lowe, Steven v. Difei Transport LLC

Page 11

1         A.   No.

2         Q.   Okay.  So they would -- so kind of all of

3    the different liaisons would interact with the

4    Witherite firm, it wasn't an exclusive

5    relationship.

6         A.   Theoretically, yes, just to ensure that

7    nobody is missed or that there isn't a problem.

8    So it can rotate if somebody's unavailable for

9    some reason.

10        Q.   This email that we're looking at was

11   addressed to a, looks like Lindsay Tighe.

12        A.   Tighe.

13        Q.   Tighe.  Who is Lindsay Tighe?

14        A.   Lindsay is and was a clerk at the

15   practice.

16        Q.   And what was her job duties as a clerk?

17        A.   She would do clerical work and work with

18   different areas within the practice just

19   coordinating paperwork, communication, that kind

20   of thing.

21        Q.   All right.  I want to show you a couple

22   more pages.  I'm going to go to SCA14, so I'll

23   zoom in a little here.  Well, actually, let's

24   start with SCA12 so maybe you'll have enough

25   context to recognize the document.  Do you

1   recognize this document that's SCA12?  Can you see

2   this?

3        A.  Yes, I can see it.  It looks like a --

4   the format is different, but it's the way we would

5   have pulled data out of the legacy system that we

6   have.

7        Q.  Okay.  What is the legacy system?

8        A.  Centricity.

9        Q.  Is that essentially your practice

10  management software?

11       A.  Yeah, the EMR.

12       Q.  Okay.  And this specifically looks like

13  it's -- the billing notes tab of Centricity has

14  been selected?

15       A.  Correct.

16       Q.  And it looks like this goes in reverse

17  chronological order with the most recent being at

18  the top, so I'm going to scroll down two pages to

19  SCA14 which appears to be the beginning.  It looks

20  like the first entry in this billing notes tab of

21  the Centricity software was entered on July 26th,

22  2019, do you see that?

23       A.  I do.

24       Q.  Or, sorry, June 26, 2019.  That first

25  entry says Lindsay Tighe, correct?

30(b)(6) Daniel Lincoln          September 16, 2021
Lowe, Steven v. Difei Transport LLC

Page 13

1        A.   Correct.

2        Q.   Is that just denoting that Lindsay is the

3    clerk assigned to this file?

4        A.   It's just the clerk who input the data so

5    we have a track record of who's inputting data.

6        Q.   Okay.  The next entry up looks like

7    happened simultaneously, says Witherite Law Firm,

8    true?

9        A.   Correct.

10       Q.   Is that denoting that that's who the

11   referral was received from?

12       A.   Correct.

13       Q.   Okay.  The third entry up from the bottom

14   starting in the furthest left-hand column says

15   PI-date of incident, true?

16       A.   Yes.

17       Q.   And then in the notes section it says

18   June 26, 2019.

19       A.   Correct.

20       Q.   And that entry was created on June 26th,

21   2019 as well?

22       A.   Correct.

23       Q.   So this is indicating the date that the

24   accident happened, true?

25       A.   It's the date that we received the

Page 14

1    information about the patient.  I don't know if

2    that's the date the accident happened or whatever

3    may have happened with it.  That's the date that

4    we received the information.

5         Q.  Okay.  So it says date of incident on the

6    left-hand column, but that would not indicate that

7    it corresponds to whatever the accident date is?

8         A.  I would -- correct.  I would double-check

9    that.

10        Q.  Okay.

11        A.  It could be.  I just don't know.

12        Q.  Sure.  Generally what intake process does

13   Spine Center Atlanta follow for a new patient that

14   they've been referred?

15        A.  Well, they can call -- sometimes they

16   call in to the office or they come through,

17   there's a referral from a physician liaison that

18   would then direct them to an appropriate

19   department.  But depending on what their need is,

20   they are then referred to that department for a

21   consult, and that would then begin the process.

22        Q.  Do you collect the patient's health

23   insurance information at that time?

24        A.  Yes.

25        Q.  Do you know in this case if Steven Lowe's

Case 1:20-cv-05224-CAP  Document 161  Filed 02/05/23  Page 15 of 104
30(b)(6) Daniel Lincoln          September 16, 2021
Lowe, Steven v. Difei Transport LLC

Page 15

1  health insurance information was collected?

2      A.  I don't know specifically.  I'd have to

3  look through the documents and see.

4      Q.  Okay.  I'd like to talk now about the

5  various communications between Spine Center

6  Atlanta and Mr. Lowe or his attorneys.  Are you

7  aware of any contact between Spine Center Atlanta

8  and anyone at the Witherite Law Group?

9      A.  Just generally as a matter of course of

10  business, yeah, there's contact.

11      Q.  What general contact are you aware of?

12      A.  Just status updates sometimes or the

13  referral, for example.  Anything that may be

14  pertinent just to the care of the patient that's

15  been referred to us by Witherite.

16      Q.  So generally speaking it is common course

17  of business for Spine Center Atlanta to remain in

18  regular contact with counsel for their patients

19  over the course of treatment, true?

20      A.  No.  Once a patient's been referred to us

21  then we will care for the patient.  If for some

22  reason there is something that is pertinent to the

23  patient that we need to know, then we may be

24  contacted by the patient's counsel for that.  But

25  it's not regular -- it's not regular contact or

Page 16

1    conversation or anything like that.  It's just

2    there may be more than one patient or there's

3    different things that can be going on.

4        Q.  Earlier you mentioned that you were

5    generally aware of status updates as it relates to

6    communications between Spine Center and Witherite.

7    What are those status updates comprised of?

8        A.  From time to time, so if a patient has

9    been referred to us, if we've operated on the

10   patient or the patient is no longer in our care,

11   then those kinds of things are communicated when

12   the care has been completed or the patient is no

13   longer in our care, something like that.

14       Q.  In this case specifically for Steven Lowe

15   has any employee of Spine Center sought

16   authorization or approval from any employee of

17   Witherite prior to rendering treatment to

18   Mr. Lowe?

19       A.  No.  That would be a decision of

20   Mr. Lowe.

21       Q.  Okay.  So it's your testimony that when a

22   patient is being scheduled for treatment that the

23   Spine Center Atlanta does not consult that

24   patient's attorneys prior to going forward with

25   that treatment?

Page 17

```
 1         A.   No.

 2         Q.   And there was no prior consultation with

 3    Mr. Lowe's attorneys in this case specifically.

 4         A.   No.

 5         Q.   In this case has at any point throughout

 6    the lifespan of this lawsuit has Spine Center

 7    communicated with Witherite and requested updates

 8    on the status of the litigation?

 9         A.   Potentially.  I don't know specifically,

10    but that potentially could be the case.

11         Q.   What would you need to look at in order

12    to confirm that answer?

13         A.   There may be some document in Centricity

14    or a note of some communication between the two,

15    but sometimes, from time to time that occurs, not

16    all the time, so it just depends on the specific

17    issue with the patient or -- the specific issue of

18    the patient, could depend on that.

19         Q.   Are you aware if any employees of

20    Witherite Law Group participated in the scheduling

21    of any of Mr. Lowe's medical treatment with Spine

22    Center?

23         A.   No.

24         Q.   Does Spine Center have a policy of

25    requesting declarations pages or the amount of
```

Page 18

1   limits for any applicable insurance policies prior

2   to rendering treatment to a patient?

3        A.   No.

4        Q.   In this case do you know if Spine Center

5   communicated with Witherite Law Group to ask what

6   the applicable insurance limits were prior to

7   rendering any treatment to Mr. Lowe?

8             MS. LAWSON:  Matt, I'm sorry.  I think

9   we've lost plaintiff's counsel.

10            MR. SESSIONS:  Okay.  Yeah, I see that

11  now that I've looked at it, so we'll pause until

12  he gets logged back in.

13            THE VIDEOGRAPHER:  Would you like to go

14  off the record, counsel?

15            MR. SESSIONS:  Sure.

16            THE VIDEOGRAPHER:  The time is 2:23,

17  we're off the record.

18            (Recess)

19            THE VIDEOGRAPHER:  The time is 2:25,

20  we're back on the record.

21       A.   The answer to your specific question of

22  rendering treatment prior or obtaining limits

23  prior to rendering any care is no.  We take care

24  of the patients as they come in.  So not prior to

25  rendering care.

30(b)(6) Daniel Lincoln                    September 16, 2021
Lowe, Steven v. Difei Transport LLC

Page 19

1   BY MR. SESSIONS:

2       Q.  Is it Spine Center's practice over the

3   course of treatment to endeavor to learn the

4   amount of applicable limits associated with

5   particular insurance policies that might be

6   responsible for a plaintiff's treatments?

7       A.  More than likely, yes.  At some point

8   that typically does come up.

9       Q.  And in this case did Spine Center ever

10  communicate to Witherite and ask to learn the

11  amount of any available insurance policy limits

12  associated with Mr. Lowe's treatment?

13      A.  In conjunction with capacity to pay, so

14  when patients come to us they either have their

15  own insurance or they are self-pay or there may be

16  some other legal means or suit by which they would

17  pay their bill.  So for all patients we obtain

18  some form of payment or capacity to pay.  So in

19  that instance that conversation could have

20  occurred or may have occurred in this instance.

21      Q.  In this case did Spine Center inquire

22  into whether or not Mr. Lowe had health insurance

23  before rendering treatment?

24      A.  Typically that would be one of the topics

25  of conversation as Mr. Lowe would be scheduled.

30(b)(6) Daniel Lincoln                   September 16, 2021
Lowe, Steven v. Difei Transport LLC

Page 20

1    Insurance, self-pay or some other form of payment.

2             (Mr. Ewenike exited the Zoom deposition

3    call)

4    BY MR. SESSIONS:

5        Q.   And the reason that you inquire into

6    capacity to pay at the beginning of treatment is

7    that Spine Center does not want to render services

8    that it's not going to be compensated for, true?

9        A.   True.

10       Q.   All right.  I want to talk some more

11   about written or oral agreements relating to the

12   charges issued to Mr. Lowe in this case.  In this

13   case has Spine Center ever sought approval from

14   anyone at Witherite Law Group regarding the price

15   of any treatment rendered to Mr. Lowe?

16       A.   No.

17       Q.   Was the price of treatment ever discussed

18   with Mr. Lowe at any point?

19       A.   More than likely, yes.

20       Q.   Is it regular practice for Spine Center

21   to discuss the price of treatment with patients?

22       A.   Yes.

23       Q.   And generally where or when does that

24   conversation take place?  Is there a specific

25   person who has that conversation?  What's the

Case 1:20-cv-05224-CAP   Document 161   Filed 02/05/23   Page 21 of 104
30(b)(6) Daniel Lincoln                    September 16, 2021
Lowe, Steven v. Difei Transport LLC

Page 21

1   general practice?

2        A.   Typically during a consult Dr. Chappuis

3   will have a conversation with them about -- the

4   patient -- about what options exist to remedy

5   their ailments and discuss the option treatment --

6   treatment options and such.

7        Q.   In this case was Mr. Lowe ever asked if

8   he wanted to incur roughly $200,000 in debt for

9   the implantation of a spinal stimulator and other

10  care?

11       A.   I'm sure the conversation occurred with

12  him in regard to his care over the course of his

13  care.

14       Q.   Did anyone at Spine Center provide

15  Mr. Lowe with the option of using his health

16  insurance instead of signing a lien in order to

17  pay for his care in this case?

18       A.   When a patient comes to us we generally

19  ask them what form of payment they will have, or

20  they would be utilizing.  And again, that's either

21  self-pay, insurance, or some other form.  So

22  that's completely up to them.  Those conversations

23  are had.  That's the choice of the patient, how

24  they would pay their bill.  And typically people

25  are very aware of how they are expecting to pay

Page 22

1   for the care that we're providing, and they make

2   the choices for the care that is being provided.

3        Q.  I understand that's the general practice.

4   My question is:  Was Mr. Lowe specifically

5   presented with that choice?

6        A.  Well, that's part of our intake, so yeah,

7   that's the question.

8        Q.  Dr. Brian Adams was the primary Spine

9   Center doctor who rendered the majority of

10  treatment to Steven Lowe, true?

11       A.  I believe so, yes.

12       Q.  Is there a certain document you would

13  need to look at to confirm that?

14       A.  Yeah, just his care notes.  I don't have

15  them in front of me, so I don't have something to

16  respond to.  But in this instance with what you've

17  already said, Dr. Adams would be typically the

18  one, but --

19       Q.  And I'm inferring from that you're

20  referring to my discussion of the implantation of

21  a spinal stimulator?

22       A.  Correct.

23       Q.  Is he typically the doctor at Spine

24  Center who installs spinal stimulators in

25  patients?

30(b)(6) Daniel Lincoln                    September 16, 2021
Lowe, Steven v. Difei Transport LLC

Page 23

1        A.   Mostly, yes.

2        Q.   Are there other doctors at Spine Center

3   who install spinal stimulators?

4        A.   Dr. Chappuis could.

5        Q.   I'll represent to you that Dr. Adams is

6   the Spine Center doctor who performed the surgery

7   on Mr. Lowe and installed the stimulator and gave

8   him various other treatment over the course of his

9   time.   Dr. Adams is compensated from the payment

10  of Mr. Lowe's medical bills, true?

11       A.   Under others, yes.

12       Q.   What does that mean?

13       A.   Well, he's salaried by Spine Center, so

14  he's paid out of the -- out of just the operations

15  of Spine Center, not 1:1 relationship between

16  Mr. Lowe and Dr. Adams.

17       Q.   So Dr. Adams receives a salary from Spine

18  Center?

19       A.   Yes.

20       Q.   And that salary is a static number that

21  is not at all affected by the amount of income

22  that is derived from Dr. Adams' treatment of

23  various patients?

24       A.   Correct.

25       Q.   Dr. Adams does not have any ownership

 1   interest or general ability to derive payment of

 2   profits from Spine Center Atlanta?

 3        A.  No.

 4        Q.  I'm going to share scene with you again.

 5   I'm going to talk now about what is referred to as

 6   the letter of protection for Mr. Lowe.  Are you

 7   familiar with what a letter of protection is?

 8        A.  Yes.

 9        Q.  Okay.  And what is generally a letter of

10   protection as it pertains to Spine Center's

11   practice?

12        A.  This is basically the -- a form of

13   payment or when we ask patients for, you know,

14   their form of payment, insurance or self-pay, then

15   the letter of protection is representative of that

16   for the patient, that they are expecting to use

17   some proceeds if they exist from some injury to

18   cover their care at Spine Center.

19        Q.  And the page we're looking at here is

20   SCA126.  From looking at this does this appear to

21   be the letter of protection that Steven Lowe

22   signed relating to his care at Spine Center?

23        A.  Yes.

24        Q.  Are you familiar with the various terms

25   included in this contract?

Page 25

1       A.   For the most part.

2       Q.   Okay.  There is a term in this contract

3   that requires the patient to provide notice to

4   Spine Center if Mr. Lowe decides to change his

5   attorney and he must do that within 10 days, true?

6       A.   I don't have that by memory.

7       Q.   Okay.  Let's see if I can -- that's okay.

8   Let me see if I can find it in here.

9            All right.  So looking at SCA127, the

10  second paragraph from the bottom here I believe

11  includes some of that language.  Can you review

12  that paragraph and then let me know when you've

13  finished reading it.

14      A.   Yes.  They have 10 days to inform Spine

15  Center Atlanta if they have any change in counsel.

16      Q.   And what's the purpose in requiring

17  Mr. Lowe to notify Spine Center if he decides to

18  get a different attorney?

19      A.   Just so we can update with him capacity

20  to pay or inform him of current status of his

21  care.

22      Q.   Moving to the third page of this document

23  there is a spot for Mr. Lowe's attorney to sign

24  this document; is that true?

25      A.   Yes.

Page 26

1      Q.   And is it general practice of Spine

2   Center Atlanta to require the patient's attorneys

3   to also sign a letter of protection?

4      A.   As the attorneys are working on their

5   behalf for the form of payment they will make for

6   their care, then those are the parties that are

7   involved under this letter of protection.

8      Q.   So, in other words, Spine Center has a

9   contractual relationship with Mr. Lowe's attorney

10   in addition to Mr. Lowe himself; is that right?

11      A.   As it pertains to the payment, yes.

12      Q.   Is it Spine Center Atlanta's policy to

13   have all patients and their attorneys execute one

14   of these letters of protection?

15      A.   If they're a patient coming to us with

16   some kind of personal injury where they are

17   represented by counsel and that's the way that

18   they've chosen to pay for their care.

19      Q.   Does Spine Center Atlanta provide

20   treatment to any patients who are not represented

21   by attorneys?

22      A.   Yes.

23      Q.   I want to go back to SCA126, this third

24   paragraph here says that, I, as the patient,

25   understand and agree that no distribution of

Page 27

1    monies will be made to me until such time as all

2    of the providers have been paid in full.  That is

3    what it says, true?

4          A.   True.

5          Q.   Does Spine Center Atlanta always require

6    full payment of the amount of the medical bills

7    when a letter of protection has been signed like

8    in this case?

9          A.   Yes.

10         Q.   What happens if a case goes to trial and

11   a jury does not award a Spine Center patient the

12   amount of money -- or the full amount of your

13   medical bills?

14         A.   Then negotiation occurs or sometimes we

15   will then have to write down the amount that we

16   are owed.  It just depends on -- each situation is

17   different.  But we expect to be paid for the work

18   that we perform or the care that we provide, so

19   from that standpoint we begin then with that

20   negotiation or at that point where things stand

21   with the facts that exist.

22         Q.   When you say a negotiation takes place,

23   what do you mean by that?

24         A.   Well, if there isn't enough to cover the

25   bill then you've got to talk to them about where

Page 28

1  else they're going to come up with the money to

2  pay the bill.

3      Q.  So the negotiation has to do with finding

4  additional sources of money.  Spine Center Atlanta

5  does not negotiate the amount it's willing to

6  accept for its bills?

7      A.  We do that as well, but we go to the

8  patient and the patient has a balance, and so we

9  talk to the patient about paying the balance that

10  they have, and we will work with them to cover

11  that balance and talk with them about options that

12  exist for their capacity to pay whatever may be

13  left over, and we do then at that point would take

14  into some consideration some kind of hardship or

15  extenuating circumstance regarding the bill.

16      Q.  So there are times when Spine Center will

17  accept less than the amount billed in satisfaction

18  of this letter of protection.

19      A.  Yes.

20      Q.  In the event a plaintiff does not recover

21  enough to satisfy the letter of protection and

22  doesn't have their own -- enough personal

23  additional funds to satisfy the letter of

24  protection, does Spine Center have a practice of

25  pursuing their patients into bankruptcy if they

Page 29

1   cannot pay the bills?

2       A.  Typically not.  I won't say never, but

3   typically not.  That's not the case.

4       Q.  Are you aware of any times where Spine

5   Center has pursued a patient into bankruptcy in

6   order to satisfy a letter of protection?

7       A.  No, I'm not.  I wouldn't know if they've

8   gone into bankruptcy, but no.

9       Q.  When there is a recovery insufficient to

10  satisfy the letter of protection and the bills

11  associated with a plaintiff's care, do you

12  typically negotiate with the patient directly or

13  do you negotiate with their attorney?

14      A.  With the patient.

15      Q.  So Spine Center does not negotiate with

16  the attorneys when they are trying to satisfy a

17  letter of protection but there are insufficient

18  funds?

19      A.  Not with a -- if the case is all settled

20  and that case is all done then we are talking with

21  the patient regarding the balance.  The attorney

22  has no jurisdiction over that.

23      Q.  Are there times when a patient recovers

24  more than the amount of the medical bills but

25  Spine Center still negotiates the amount of the

Page 30

1    bills or the amount needed to satisfy the letter

2    of protection?

3         A.   Possibly.

4         Q.   What information would you need to be

5    able to answer that question definitively?

6         A.   Well, just a specific example, I guess,

7    every patient and every settlement is different.

8    And it depends on the circumstance of that

9    patient, how big the problem was, how many care

10   providers they had, you know, what their total

11   care costs from various providers, not even

12   including Spine Center, over the course of time.

13   So it just depends.

14        Q.   Sure.  And in this case I'm asking a

15   general question or if you're aware of anytime

16   where, for example, a patient has recovered, let's

17   say, you know, for this example $250,000 from

18   their lawsuit, the amount of their bill with Spine

19   Center is $200,000, but Spine Center has still

20   negotiated to settle for an amount less than what

21   the bills originally were.

22        A.   Yeah, I'm not aware of that specific of

23   information.

24        Q.   Who at Spine Center would be aware of

25   that information?

Page 31

1     A.  Well, typically we're not -- that's not

2  how the conversation goes.  So from that

3  standpoint unless it's public on how much the

4  settlement was, that is typically the -- the

5  attorney is managing the proceeds of some

6  settlement to take care of the care providers.

7  So -- and that's typically done through our

8  collection department as claims settle.  So that's

9  how that would go.

10     Q.  So what I'm hearing is there are times

11  when Spine Center is negotiating settlement of

12  bills or a letter of protection but they -- Spine

13  Center does not know how much the patient

14  recovered in their lawsuit?

15     A.  I don't know specifically.  Like I said,

16  from time to time perhaps that is part of the

17  conversation, maybe it isn't.  I just don't know.

18  It just depends on that situation.  But it isn't a

19  formality or a form of the -- it's not a 1:1

20  relationship.  The settlement was this amount, our

21  bill is that amount, and we, you know, take the

22  majority of it or something like that.  That's not

23  the way the conversation typically goes.

24     Q.  There's a back and forth or a negotiation

25  and then every result the different, true?

Page 32

1    A.   True.  There's usually an offer and then

2    we go to the patient and say, Your balance is

3    this, and start to talk with the patient about

4    what the balance is and come up with a way that

5    our billed charges can be covered.

6    Q.   Earlier you also mentioned as another

7    option Spine Center Atlanta will write down its

8    bills.  Is that what you're referencing?

9    A.   No.  That's at some point when the bill

10   is uncollectible or there's no viable way that we

11   will receive it, so it becomes some -- a bad debt.

12   Q.   And what does Spine Center do with bills

13   that become a bad debt?

14   A.   In the accounting world, we write them

15   off.

16   Q.   Does Spine Center typically negotiate

17   settlement of the amount of the bills or letter of

18   protection before or after the patient achieves a

19   settlement or a judgment in their case?

20   A.   Depends on the time, I think.  It could

21   be that, you know, a settlement draws on and the

22   longer time goes the more expensive that claim

23   becomes.  So there are times that, depending, that

24   we may approach a patient for payments.

25   Q.   If Spine Center needed to settle the lien

Page 33

1    at issue in this case or the letter of protection

2    at issue in this case, what information would

3    Spine Center need to know in order to start that

4    process?

5          A.  I would contact the patient, we would

6    contact the patient and say, You've got a bill

7    here, or we'd send them a bill, and start to talk

8    to them about how they're going to pay the bill.

9          Q.  Has Spine Center Atlanta assigned its

10   interest in Steven Lowe's letter of protection to

11   anyone else?

12         A.  Not to my knowledge.

13         Q.  At Spine Center Atlanta is there a

14   primary point of contact for communications

15   between a patient's attorney and Spine Center?

16         A.  No, there's a team that would field calls

17   if somebody was calling in.

18         Q.  Does that team have a title or name?

19         A.  Probably our personal injury department.

20   It changes from time to time, but I would think

21   that's probably where they would call in.

22         Q.  How many individuals work within the

23   personal injury department at Spine Center

24   Atlanta?

25         A.  I would say between two and five.  It

Page 34

1   just depends on volume of work.

2        Q.  Can you tell me the people, the names of

3   the employees that currently work within that

4   department at Spine Center?

5        A.  No, not by name.

6        Q.  Is that information that you'd be able to

7   obtain?

8        A.  Absolutely.  I could obtain that.  I'm

9   just not familiar with the specific names.  But

10  it's not a secret, I just don't know who they are.

11       Q.  Sure.  I'd like to talk about Spine

12  Center Atlanta's relationship with Witherite and

13  with Mr. McEvoy.  How many patients has Sean

14  McEvoy referred to Spine Center Atlanta in the

15  last five years?

16       A.  I have no idea.

17       Q.  Does Spine Center Atlanta keep track of

18  the sources of its referrals?

19       A.  Only as it pertains to a patient.  I

20  mean, that becomes part of the patient record, but

21  that's the only place it would be.

22       Q.  Generally speaking Spine Center has the

23  capability to go into its EMR software and

24  determine the source of each patient's referral?

25       A.  When you pull up the patient record, if

1    that's been captured, it would typically be

2    indicated.

3        Q.  But you're telling me there's no way to

4    aggregate that information?

5        A.  Not to my knowledge.

6        Q.  How many patients has the Witherite Law

7    Group referred to Spine Center Atlanta in the last

8    five years?

9        A.  I don't know the sum of that either.

10       Q.  So Spine Center Atlanta does not track or

11   keep up with how many referrals are received from

12   various law firms?

13       A.  No.

14       Q.  I'd like to talk about Spine Center's

15   marketing efforts for a few minutes.

16       A.  Uh-huh.

17       Q.  What marketing efforts has Spine Center

18   Atlanta undertaken with regard to advertising to

19   lawyers or law firms in the last 36 months?

20       A.  We don't typically -- we don't advertise,

21   we -- our physician liaisons are basically our

22   marketing budget, if you will.  That's the money

23   that we use to -- as our community outreach by

24   which to facilitate a patient being referred in to

25   us.  So that is the form and function of what you

Case 1:20-cv-05224-CAP  Document 161  Filed 02/05/23  Page 36 of 104
30(b)(6) Daniel Lincoln                    September 16, 2021
Lowe, Steven v. Difei Transport LLC

Page 36

1   may consider marketing.

2       Q.  Outside of the physician liaison, any

3   other forms of marketing undertaken by Spine

4   Center in the last 36 months?

5       A.  In the last 36 months, prior to COVID was

6   the last crawfish boil that we did.  Typically we

7   would do an annual, some kind of an annual event,

8   and that was typically a crawfish boil, and I

9   think the last one we did was prior to COVID, and

10  then we did one after or -- after the pandemic, we

11  did an invite to the Michelangelo exhibit in

12  Atlanta.  So that was an event that we held, and

13  those are the last two things that we've done in

14  some kind of a public invite for friends and

15  family and business associates.

16      Q.  Okay.  So let's start with the crawfish

17  boil.  Who gets invited to the Spine Center

18  Atlanta crawfish boil?

19      A.  Our business associates, vendors, people

20  that we work with on an annual basis or people

21  that are associated in some way with us, just

22  as -- those typically are the people that would be

23  invited.  Friends and family of employees,

24  employees, et cetera.

25      Q.  I'm going to share screen with you again.

30(b)(6) Daniel Lincoln                    September 16, 2021
Lowe, Steven v. Difei Transport LLC

Page 37

1    This was produced to us as part of Spine Center

2    Atlanta's document production.  Is this a flyer

3    for the crawfish boil that you're referencing?

4         A.  Correct.

5         Q.  Were members of the Witherite Law Group

6    invited to this crawfish boil?

7         A.  I don't know specifically.  I would make

8    an assumption, but I don't know specifically.

9    More than likely.  They're a business associate of

10   ours.  So more than likely they were.

11        Q.  And then there's a second page that

12   goes -- by the way that's SCA46, for the crawfish

13   boil poster.  SCA47 I believe is another attached

14   page and it references sponsorship opportunities

15   related to the crawfish boil, true?

16        A.  It does.

17        Q.  Tell me about these sponsorship

18   opportunities.  What's the purpose of having that?

19        A.  These are typically -- this is typically

20   a community event done at the cultural center, so

21   it's an open event, and therefore somebody can

22   sponsor or a community group that may want or

23   participate in this event may sponsor for a larger

24   group that they may be bringing, just as part of

25   community outreach and the way that the intent of

Page 38

1   something like this to be something in the

2   community that brings people together.

3         Q.   Do you know if Witherite Law Group

4   purchased a sponsorship for the last crawfish

5   boil?

6         A.   I do not.

7         Q.   What is Spine Center Atlanta's

8   advertising and marketing budget for 2021?

9         A.   It is the four employees that we employ

10  as physician liaisons.

11        Q.   So Spine Center does not maintain a

12  separate line item in its budget for advertising

13  or marketing?

14        A.   There's a separate line item for receipts

15  that may come in, but the bulk of that budget is

16  the four employees that are employed in that

17  capacity.

18        Q.   Currently how many patients of Spine

19  Center are receiving treatment on a contingency

20  basis or under a letter of protection?

21        A.   Oh, I don't know that.

22        Q.   Is it your position that Spine Center

23  Atlanta does not track or monitor how many of

24  their patients are treating under a letter of

25  protection?

30(b)(6) Daniel Lincoln                    September 16, 2021
Lowe, Steven v. Difei Transport LLC

Page 39

1          A.   No.

2          Q.   I'm sorry.  I want to make sure I

3     understand your answer.  Are you telling me that

4     that is not Spine Center's policy or that they do

5     not track that information?

6          A.   That's not our policy.  We know the form

7     of payment that they've given us at the time of

8     intake, and that goes into the EMR, and so

9     therefore every time that patient schedules an

10    appointment we know how we're expecting to be paid

11    or what copays exhibit.  But that's not something

12    that we track.

13         Q.   But it is possible for Spine Center

14    Atlanta to ascertain how many of its patients are

15    currently treating under a letter of protection.

16         A.   I don't know the answer to that.

17         Q.   Is there a specific amount on average

18    that Spine Center Atlanta targets or accepts in

19    satisfaction of its bills under letters of

20    protection?

21         A.   Well, we expect to be paid 100 percent of

22    our bill charged is our expectation.

23         Q.   In situations where Spine Center accepts

24    less than the full amount billed is there a

25    specific amount targeted that Spine Center seeks

1    to recover from those bills?

2         A.   I would say as close to 100 percent as we

3    can.

4         Q.   Does Spine Center have a policy regarding

5    decisions to treat patients on a lien or under a

6    letter of protection when they have access to

7    health insurance?

8         A.   No.

9         Q.   Does Spine Center prefer one form of

10   payment over the other between a letter of

11   protection or health insurance?

12        A.   No.

13        Q.   When negotiating letters of protection

14   does Spine Center have set agreements with certain

15   plaintiff's attorneys?

16        A.   No.

17        Q.   What has been Spine Center Atlanta's

18   average recovery percentage of its total amount

19   billed under letters of protection for all

20   patients treated in the last two years?

21        A.   I don't know the answer to that.

22        Q.   Does Spine Center track how much is

23   recovered under letters of protection compared to

24   the amount billed?

25        A.   Not specifically, no.  That's -- it is --

Page 41

1   the way its accounted for is you have a line

2   that's revenue that's our billed charge and then

3   there's a contractual adjustment, that is the

4   amount that -- the difference of what is charged

5   to what we collect, and we're simply just counting

6   the dollars that are coming in from the billed

7   charge.

8           And that can change as things are

9   settled, et cetera, so that number and those

10  numbers are always then changing, because things

11  can be paid a year, two, three years from the date

12  that they were counted as revenue.

13      Q.  But at some point -- I'm sorry, continue.

14  I didn't mean to cut you off.

15      A.  No, that's all right.  That's just how it

16  is accounted for, and that's how our accounting

17  system works.  So it's either by individual

18  patient, and you see what was billed, and then

19  what was collected, or you look at the way it is

20  accounted for in the accounting system, and that

21  is billed charges, what was collected, and the

22  difference on the line is a contractual

23  adjustment.

24      Q.  So what is the amount of the contractual

25  adjustment for Spine Center's patients treated

Page 42

1   under a letter of protection for the past two

2   years?

3        A.  We don't differentiate between a letter

4   of protection or some other way.  They're all

5   patients.  So it's the whole basket.  And that can

6   only -- that's determined on any given day,

7   because it changes every day when monies come in.

8   So from that standpoint those percentages change

9   day-to-day like a balance sheet.  A balance sheet

10  is a very specific point in time.  Our revenue or

11  the billed charges and what we've actually

12  collected is also just one specific point in time.

13       Q.  So your system does not differentiate

14  between patient accounts that are currently closed

15  or patient accounts where there are still pending

16  payments?

17       A.  If a patient's account is closed then

18  it's closed, then it's been settled.  If we're

19  still waiting payment on it then it would be in

20  our accounts receivable.

21       Q.  So what is the contractual adjustment

22  amount for closed patient accounts for the last

23  two years?

24       A.  I don't know the answer to that either.

25  That's also not a metric or something that we

30(b)(6) Daniel Lincoln                    September 16, 2021
Lowe, Steven v. Difei Transport LLC

Page 43

1   would collect or have.

2       Q.  Spine Center Atlanta's largest form of

3   income comes from payment under these letters of

4   protection, true?

5       A.  Well, I would say the largest form of

6   income comes from caring for the patients.  How

7   it's paid for depends on how that and what that

8   patient has for coverage.  The majority of our

9   patients are under some personal injury or

10  workers' comp or some extenuating circumstance, so

11  from that standpoint, yes.

12      Q.  So majority of your patients are treating

13  under a letter of protection, true?

14      A.  Yes.

15      Q.  But Spine Center does not track the

16  contractual adjustment on recovery for those

17  letters of protection.

18      A.  We do by specific patient or we do by our

19  profit and loss report, our financial statement

20  for the revenue that we accomplish from the billed

21  charge.  So we can see that on a month-by-month

22  basis, but we're not -- I hope that answers your

23  question.

24          But it's not something -- it's something

25  that changes as payments come in, and it's not

Page 44

1   something that we track other than what our

2   charges were and what funds have come in the door,

3   and then when funds come in the door we book it

4   against the patient's balance.

5        Q.  So Spine Center Atlanta's only way of

6   understanding its long term profitability is by

7   looking at month-to-month profit and loss

8   statements?

9        A.  That's what we look at.  That's exactly

10  correct.

11       Q.  And those monthly profit and loss

12  statements would include the amount of contractual

13  adjustments, true?

14       A.  It would include what the contractual

15  adjustment is, and the contractual adjustment is

16  the difference from the billed charge -- total

17  billed charges and monies collected for that given

18  month.

19       Q.  What is the contractual adjustment amount

20  for August 2021?

21       A.  I would have to go look.  I don't have

22  that by memory.  But it's something I could get

23  for you, I just don't have it by memory.

24       Q.  So you would be able to obtain the

25  monthly statements regarding profit and loss that

30(b)(6) Daniel Lincoln                    September 16, 2021
Lowe, Steven v. Difei Transport LLC

Page 45

1   would show contractual adjustments for the last

2   two years, true?

3       A.  Yes.

4       Q.  What is the payer mix or percentage of

5   Spine Center Atlanta's patients who treat under

6   those various methods of payments we've been

7   discussing, whether it's a letter of protection or

8   health insurance or walk-ins?

9       A.  Typically I would say 60 to 80 percent of

10  our patients are under some form of letter of

11  protection or injury, probably 10 percent are

12  commercial insurance or some kind of health

13  insurance, and then the rest would be self-pay.

14      Q.  Does Spine Center Atlanta accept Medicare

15  or Medicaid?

16      A.  No, we do not.

17      Q.  Spine Center Atlanta is exempt from

18  Medicare-Medicaid, true?

19      A.  We are nonparticipating.

20      Q.  Why doesn't Spine Center Atlanta

21  participate in Medicare and Medicaid?

22      A.  Number one, we're not obligated to.  And,

23  number two, the requirements or the scrutiny or

24  what we would have to do to participate is

25  extremely expensive, and it's just not something

Page 46

1    that our practice is set up to cover that expense

2    of caring for those patients.

3         Q.  Are you aware of the various health

4    insurance providers that Spine Center Atlanta did

5    accept or do business with in 2020?

6         A.  Not specifically, not which ones.

7         Q.  Did Spine Center Atlanta do business with

8    Cigna in 2020?

9         A.  I don't know specifically.

10        Q.  Does Spine Center Atlanta currently

11   accept Cigna health insurance?

12        A.  As far as I know.  I don't know

13   specifically if they do or not, and we are also

14   nonparticipating in commercial insurance, so it

15   would also be on a nonpar basis.

16        Q.  What does that mean?

17        A.  We're not in network with Cigna or

18   Humana, but we'll accept their insurance and put a

19   bill forward.

20        Q.  I'm going to share screen with you again.

21   I did a quick search on Cigna's network, and I'll

22   represent to you this will be marked as

23   Defendants' Exhibit 2.

24            (Defendants' Exhibit 2 marked)

25   BY MR. SESSIONS:

Page 47

1     Q.  This is a Cigna provider page for Brian

2  Adams, MD.  His practice is listed as Atlanta

3  Orthopedic Surgery Center, LLC at 3161 Howell Mill

4  Road.  That is Spine Center Atlanta, true?

5     A.  Well, Spine Center Atlanta and Atlanta

6  Orthopaedic Surgery Center I think are two

7  different LLCs.  And Dr. Adams can be --

8  potentially could be in network with a provider

9  where the practice is not.  So that's not unusual.

10  I would just have to see what the different

11  entities are, how they are registered, because

12  that's all very specific.

13     Q.  Is Atlanta Orthopaedic Surgery Center one

14  of the centers that operates under the Spine

15  Center umbrella?

16     A.  I don't know the relationship in terms of

17  legally how they are set up, but they are separate

18  entities.  I believe -- I would have to look or

19  understand if Spine Center Atlanta is a

20  wholly-owned subsidiary of Atlanta Orthopedic

21  Surgery Center.  Actually, I think they're

22  separate, the more I think about it.  And I would

23  just have to go refresh.  I don't know that from

24  memory, but I would go and refresh.  But I believe

25  they are separate entities.

30(b)(6) Daniel Lincoln                    September 16, 2021
Lowe, Steven v. Difei Transport LLC

Page 48

1      Q.  So it's possible that Atlanta Orthopedic

2   Surgery Center, LLC might be participating in the

3   Cigna network but that would be different from

4   Spine Center.

5      A.  Right.  And I doubt that the surgery

6   center is participating.  It is more likely that

7   Dr. Adams is registered with Cigna or could be

8   participating.  That's possible.  But I don't

9   think the surgery center is participating.

10     Q.  Does Dr. Adams render care outside of his

11  practice with Spine Center?

12     A.  I don't know.  That's possible.  But I

13  don't know the answer to that.

14     Q.  So if it says that Dr. Adams accepts

15  Cigna healthcare, that would not be pertinent to

16  Spine Center treatment.

17     A.  It could be, as he is providing

18  professional services to a patient, it could be

19  that his bill could go to Cigna and it could be

20  covered, depending on the rules and regulations of

21  the way that that patient has been -- has come in.

22         If that patient is under an LOI, letter

23  of protection, we may be prohibited from sending a

24  bill to Cigna, or we may have some send a bill to

25  Cigna first and see if they cover it and then as a

Page 49

1   secondary claim it may be under the LOP.  It just

2   depends on how that might be set up.

3       Q.  Generally when a patient is signed up

4   under a letter of protection are they opting out

5   or prohibited from using their health insurance to

6   pay for treatment with Spine Center?

7       A.  I believe that is a clause in that letter

8   of protection document we looked at.  I just don't

9   have that to memory.  I would have to look.  But I

10  believe that's the case.

11      Q.  All right.  Earlier you told me that

12  Spine Center was nonparticipatory with health

13  insurance, but that essentially that they were

14  happy to bill health insurance as an

15  out-of-network provider and see what got paid.

16  I'm just trying to figure out if Dr. Adams is in

17  network with Cigna when he's giving Spine Center

18  treatment or if that's with something else.

19      A.  That more than likely is -- I don't know

20  the answer to that.  If he's caring for a patient

21  under an LOP, a letter of protection, and if

22  there's a clause in the letter of protection that

23  says that you can't and you're not billing

24  insurance for that, then our Centricity system or

25  the CareCloud system would be directed under that

30(b)(6) Daniel Lincoln                    September 16, 2021
Lowe, Steven v. Difei Transport LLC

Page 50

1   type of work flow.  That's exactly why we have

2   those kinds of parameters in the EMR such that

3   they can go through their appropriate work flow.

4        Q.  Okay.  What about the 10 percent of Spine

5   Center patients who are treating on insurance

6   instead of a letter of protection?

7        A.  Then we would bill their insurance, as it

8   would go through that work flow for the

9   clearinghouse for the type of insurance they have,

10  and we would send out a claim through our EMR for

11  their insurance that they had.  Could also be that

12  they pay us directly and they submit the claim to

13  their insurance.  It just -- that happens as well.

14  It just depends.

15       Q.  Does Spine Center Atlanta have a contract

16  with Cigna?

17       A.  No.

18       Q.  Does Spine Center Atlanta have any type

19  of agreement with Cigna that would dictate how

20  much Cigna is willing to pay for various medical

21  services?

22       A.  No.  To my knowledge we're not in network

23  with Cigna.

24       Q.  Does Spine Center have an agreement with

25  any other health insurance companies that would

Page 51

1    dictate how much that health insurance company

2    will pay for Spine Center medical treatments?

3         A.  Not to my knowledge.

4         Q.  And I want to talk now about the bills

5    that were specifically issued to Mr. Lowe in this

6    case.  Have you had a chance to review the medical

7    bills issued to Mr. Lowe?

8         A.  I did review his account summary, or I

9    have looked at it.

10        Q.  Are you generally familiar with CPT codes

11   and what they mean?

12        A.  Generally, but not necessarily committed

13   to memory, but I know what CPT codes are.

14        Q.  If we were discussing specific CPT codes

15   found on Mr. Lowe's bills or specific entries on

16   Mr. Lowe's bill, would you be competent to respond

17   to those questions on behalf of Spine Center?

18        A.  Only -- not from a clinical standpoint or

19   from his medical treatment, only from a standpoint

20   of how they are input in our system or our EMR or

21   our billing system.

22        Q.  Okay.  Let's try to talk through some of

23   these entries and see if you're able to respond on

24   Spine Center's behalf.  You want me to pull the

25   bills up and share screen and look at it, or how

Page 52

1    do you want me to do it?

2          A.   Share your screen.   That would be the

3    most convenient.

4          Q.   Okay.   All right.   I'm showing you SCA,

5    the bill is SCA148 through 150.   Looking at this,

6    does this appear to be the bill issued to Mr. Lowe

7    by Spine Center Atlanta in this case?

8          A.   This is actually just a printout of his

9    account, so not necessarily -- this isn't a bill

10   that goes to him, this is a summary of his account

11   with us and the treatment that he's provided, or

12   that he's received.

13         Q.   Okay.   This one is three pages long and

14   spans from July 2nd, 2019 all the way through

15   September 29th, 2020.   Are there any amounts

16   billed to Mr. Lowe or services rendered to

17   Mr. Lowe that would not appear on this summary?

18         A.   Not between those dates, no.

19         Q.   Okay.   Does Spine Center Atlanta maintain

20   a chargemaster?

21         A.   Yes.

22         Q.   Okay.   Has it maintained the same

23   chargemaster for the past three years?

24         A.   I think there was an adjustment to the

25   chargemaster during 2020, at the time of the

Page 53

1    pandemic I think was the last adjustments made.

2    From time to time adjustments are made to the

3    chargemaster.

4         Q.  All right.  I want to start -- I'll zoom

5    in so we can see it better.  I want to start by

6    looking at this entry on June 1st, 2020.  Spine

7    Center billed CPT code 63650 to implant neuro

8    electrodes for a spinal stimulator, and that

9    charge was 23,423.86.  Do you see that?

10        A.  I do.

11        Q.  There's only one CPT code and one charge

12   for this entry.  Is there any distinction or

13   division between a doctor's fee and a facility's

14   fee?

15        A.  Typically there is.

16        Q.  Do you see one on this summary?

17        A.  I would have to look through it.  I'm not

18   sure your question.

19        Q.  Sure.  I just see one code and then one

20   specific amount.  My question is:  How do I

21   determine if that is all facility fee, all

22   physician's fee, or some combination of both?

23        A.  Well, based on the CPT code, I would look

24   at the definition of the CPT code and then that

25   will tell us.  It may just be the amount for the

1    device that was implanted.  But I'd look at the

2    CPT code.

3         Q.   Okay.  So for this specific entry that

4    we're discussing, June 1st, 2020 with CPT code

5    63650 with the amount being $23,423.86, how did

6    Spine Center determine that that amount should be

7    charged for that service?

8         A.   That would be based on our chargemaster.

9    So that CPT code has an amount associated with it.

10   And the CPT code 63650 is the percutaneous

11   implantation of a neurostimulator.  So it's the

12   charge --

13        Q.   So it's just purely based on what the

14   chargemaster says.

15        A.   Absolutely.

16        Q.   Looking onto this next page but billed on

17   the same date, June 1st, 2020, we have another

18   entry with the same CPT code, 63650 and the amount

19   is $24,919.1.  My question is same CPT code, same

20   date, but different charged amount.  Why is that?

21        A.   I don't know.  I'd have to look into the

22   individual -- into the individual postings to see

23   what the difference might be.  One, I would have

24   to look beyond this document to see what the

25   postings were.

Page 55

1      Q.  What document are you referencing that

2  would contain what you're calling postings?

3      A.  Well, this is a summary of the charges.

4  So it would be the posting itself.

5          THE VIDEOGRAPHER:  I apologize for the

6  interruption, Counsel.  I believe Mr. McEvoy

7  dropped out of the meeting again.

8          MR. SESSIONS:  Understood.

9          THE VIDEOGRAPHER:  Would you like to go

10  off the record?

11         MR. SESSIONS:  Yes.

12         THE VIDEOGRAPHER:  The time is 3:28,

13  we're off the record.

14         (Recess)

15         THE VIDEOGRAPHER:  The time is 3:29,

16  we're back on the record.

17         MR. SESSIONS:  Madam Court Reporter, can

18  you reread the last question and answer.

19         (Court reporter read requested portion.)

20     A.  Posting may also have some op notes or

21  something, and specifically with spinal cord

22  stimulators and with this charge I believe it

23  depends on how many electrodes are being placed.

24         So with the CPT code 63650, if there are

25  multiple leads being placed or depending on what

Case 1:20-cv-05224-CAP   Document 161   Filed 02/05/23   Page 56 of 104
30(b)(6) Daniel Lincoln                    September 16, 2021
Lowe, Steven v. Difei Transport LLC

Page 56

1  the clinical ailment is of the patient and the
2  remedy, there exists the potential that that CPT
3  code would be billed twice with whatever amounts
4  are determined, depending on the electrodes being
5  placed or that device and the op notes or the
6  further documentation to the posting specifically
7  would tell me that.
8        Q.   I've shared screen again.  Can you see
9  this?
10       A.   Yes.
11       Q.   Okay.  So this is a different ledger.
12  This was produced as SCA129 through 134.  This
13  looks like a ledger in a slightly different
14  format.  Does this contain the full postings that
15  you're referencing?
16       A.   Probably not.  This is our Centricity
17  system, and it may contain more information, but
18  I'd have to look and see if it contains enough
19  information to validate what I'm thinking.
20       Q.   Okay.  But you believe there would be
21  some format of the bills that would show the full
22  extent of the individual postings that might
23  explain price differences for the exact same CPT
24  code and procedure.
25       A.   I think it would have to do with the

Page 57

1    electrodes, and if there are two electrodes or

2    something like that associated with this patient.

3    So, again, I would look at the op notes to

4    determine what was done, and that is, I think,

5    what would be most specific in answering your

6    question.

7         Q.  So a difference in number of electrodes

8    might make the difference between 23,423 and

9    24,919?

10        A.  Correct.  It could be that, you know, for

11   one electrode they're using one type and another

12   electrode they use a different type, depending --

13   there's all kinds of different variances that

14   exist with these kinds of implantables to obtain

15   an optimal outcome for the patient.

16            Those things do exist, I just don't know

17   specifically to this patient or to that answer.

18   But that's the direction that I would go in to

19   ascertain the answer is the device, and then the

20   variances or options that exist with that device

21   as it pertains to the patient's ailment and an

22   expected outcome in choosing that device and the

23   various electrodes that may be used.

24        Q.  Do you know the specifics of the device

25   that was billed for here for Mr. Lowe's treatment?

Case 1:20-cv-05224-CAP  Document 161  Filed 02/05/23  Page 58 of 104
30(b)(6) Daniel Lincoln                    September 16, 2021
Lowe, Steven v. Difei Transport LLC

Page 58

1        A.   I do not.

2        Q.   But that is information that is available

3   to Spine Center, true?

4        A.   It would be in the op notes, yes.  That

5   would be something that really Dr. Adams would

6   respond to, I think, in his op notes.

7        Q.   So do you have an understanding, then, of

8   why Mr. Lowe was charged twice on June 1st for the

9   same CPT code in separate amounts?

10       A.   I would make the assumption that it was

11  the placement of two leads, which this CPT code,

12  that's the way the CPT code would be billed.

13       Q.   All right.  And I want to look at the

14  billing entries for August 3rd, 2020, which are

15  generally here below.  Here we have an entry, CPT

16  code 63685, insert/redo spine N generator, billed

17  in the amount of $8,282.50, true?

18       A.   Yes.

19       Q.   What is that code entry referencing or

20  what is that billing entry referencing?

21       A.   63685.  Let's see here.  So 63685 is

22  reported in addition to 63650 for the insertion or

23  replacement of the pulse generator or receiver.

24            So sometimes -- and this is an example

25  where there are corresponding codes.  Sometimes

Page 59

1   also there are time codes associated with these

2   kinds of things.  So that's why there are so many

3   CPT codes, you just go to the book and look and

4   see.  But it's a function of the chargemaster.  So

5   that's what this code would represent.

6       Q.  So my general understanding of a spinal

7   stimulator is that essentially it has two pieces,

8   you have the generator that sits outside of the

9   body and then there are the neuro electrodes that

10  are wires that extend from the generator

11  underneath the skin.  Is that your understanding

12  as well?

13      A.  Not particularly or specifically.  This

14  one would be subcutaneous, so it would go under

15  the skin.  They make a little pocket where it

16  would sit.  So I think there are many different

17  types and forms from many different companies, and

18  there are -- but again, that's something clinical

19  that I don't know what specifically Dr. Adams

20  would have chosen or used in that regard.  But I

21  am aware that they do go under the skin.  So from

22  that standpoint I think there are variances.

23      Q.  Understood.  So looking at August 3rd,

24  2020, we've been discussing the charge for

25  8,282.50 for inserting the generator.  If you look

Page 60

1    down two entries there's another charge under the

2    same CPT code with the same description but the

3    amount is less, it's for $5,874.11.  Does this

4    mean that two generators were installed and that

5    they cost different amounts?  Why are these prices

6    different?

7         A.  That could very well be.  You know,

8    depending to the situation with Mr. Lowe and his

9    ailments, there could very well have been two

10   spinal cord stimulators, one at the cervical, one

11   at the lumbar, I don't know.  That's where I would

12   go to the op notes and understand from his bill

13   here the overview, what his care plan was and

14   what's being done.  It's hard to ascertain that

15   from looking at the bill.

16        Q.  And Spine Center generally and you

17   specifically do have access to Dr. Adams' op

18   notes, true?

19        A.  Yeah, they would be in the EMR.

20        Q.  But as you sit here today, you don't have

21   the requisite knowledge to look at these billing

22   entries and correlate them to devices or care that

23   Mr. Lowe received.

24        A.  No.  That would be -- I think that would

25   be a pertinent -- or a question and an answer for

1    the physician from a clinical standpoint.

2         Q.  Maybe I'm wrong, but I'm doubtful that

3    Dr. Adams is going to be able to explain to me why

4    certain amounts were charged for different things.

5    So who is going to be able to answer those types

6    of questions for me?

7         A.  Well, I think it's just something we

8    would have to look at the detail behind this, and

9    then we can provide you a supplement, I think, or

10   something like that.

11        Q.  Okay.  Looking at the -- I just want to

12   finish going through this to make sure I have a

13   full understanding.  Looking at the same entry

14   date, August 3rd, 2020, there's a code 63650,

15   implant neuro electrodes.  This code has two units

16   and the total amount charged was $46,847.72.  Is

17   this another entry that you or someone else would

18   have to go and study further to understand or be

19   able to explain why this amount was charged?

20        A.  Well, not necessary -- I would just go in

21   and see what we did for this patient.  And it

22   appears to me that he's had two implants or two

23   spinal cord stimulators implanted or perhaps, you

24   know, depending on where his problem is in his

25   spine, there could have been multiple, if it's

Page 62

1    from his cervical spine all the way down to his

2    lumbar spine.  That's -- all we have to do is go

3    and look at it and see what has occurred with him

4    and what his problem is.

5        Q.  Okay.

6        A.  And then we would then -- that would be

7    reflected in this overview of his charges.  So I

8    just -- I haven't seen that, so I don't know if

9    he's got a, you know, a problem from his neck all

10   the way down and how that was remedied.

11           So I'm only speculating for you, but

12   these charges are put in our system as that care

13   is provided.  So from that standpoint there is a

14   direct correlation to this overview to whatever

15   implants he has, I'm confident of that.

16       Q.  Who inputs those charges into the system?

17       A.  Either Dr. Adams or a clerk from a sheet

18   that would be filled out, either during the

19   summary or postop.  It could be that Dr. Adams

20   does it after the case and/or when he's dictating

21   his op notes.

22       Q.  Okay.  Just to close the circle here, I

23   know this is going to feel a little repetitive,

24   but bear with me.

25       A.  No worries.

30(b)(6) Daniel Lincoln          September 16, 2021
Lowe, Steven v. Difei Transport LLC

Page 63

1      Q.   One more entry for August 3rd, 2020.

2   This is code 63650 implant neuro electrodes, two

3   more units, and once again a different price,

4   $34,225.34.  Does your answer for this charge

5   remain the same as the ones we discussed above,

6   that you would need additional time to look at the

7   op notes and various other things to understand

8   why that amount was charged?

9      A.   Yes.

10     Q.   Just in looking at this, once again

11  apologies if this feels repetitive, any

12  understanding as to why the amounts may be

13  different for those two sets of charges for the

14  same day, one 46,000, one 33,000?

15     A.   I anticipate that they are -- that they

16  are different types of electrodes that are used or

17  they are different prices, and associated with the

18  CPT code it is a pass-through, so, you know,

19  they're inputting whatever the charge is for the

20  device that's used.  Because obviously we don't

21  make the electrodes and we don't make the

22  generator, so there's probably some variance in

23  there based on the type of material it is or the

24  manufacturer or whatever that might be.

25     Q.   How many spinal stimulators did Spine

Page 64

1   Center Atlanta install in 2019 and 2020?

2        A.  I don't know the answer to that.

3        Q.  Is it possible using Spine Center's EMR

4   software or any other system in Spine Center's

5   possession to determine how many stimulators it

6   installed in 2019 or 2020?

7        A.  I don't know the answer to that either.

8        Q.  How much did Spine Center Atlanta charge

9   other patients besides Mr. Lowe for these same CPT

10  codes, 63685 and 63650, in 2019 and 2020?

11       A.  I don't know the answer to that, other

12  than all things being equal, it would be the same,

13  all things being equal being the manufacturer, the

14  type, whatever parameter determines the amount

15  that's input, it would then be the same.

16       Q.  So if a patient who was a health

17  insurance patient underwent a procedure with these

18  same codes, 63685 and 63650, would the amount that

19  patient was charged be the same as what was

20  charged to Mr. Lowe?

21       A.  Under my understanding, all things being

22  equal from the implant itself or whatever is

23  determining any variance, they would be charged

24  the same.

25       Q.  So to make sure I understand your answer,

1    you're saying if the procedure and device used

2    were identical, the price charged to them would be

3    identical as well.

4         A.  Correct.  We don't differentiate between

5    a commercial insurance person or a self-pay person

6    or a letter of protection patient in terms of the

7    charges.  That would be the same.  So when you're

8    comparing one patient to another, which is

9    something we typically don't do, but from your

10   question, all things being equal, it would be the

11   same.

12        Q.  In terms of amount accepted for payment

13   of those charges, is that amount also equal

14   between self-pay, health insurance, and letter of

15   protection patients?

16        A.  Yes.  We expect to collect 100 percent of

17   our bill charged.

18        Q.  How much did Spine Center Atlanta accept

19   in satisfaction of its bills issued in 2019 and

20   2020 for services billed under CPT code 63685 and

21   63650 for self-pay patients?

22        A.  I don't have that information.  I don't

23   know.

24        Q.  How much did Spine Center Atlanta accept

25   in satisfaction of its bills issued in 2019 and

30(b)(6) Daniel Lincoln                    September 16, 2021
Lowe, Steven v. Difei Transport LLC

Page 66

1    2020 for services billed under CPT codes 63685 and

2    63650 for patients who treated under a letter of

3    protection?

4         A.   I don't have that information either.

5         Q.   How much did Spine Center Atlanta accept

6    in satisfaction of its bills issued in 2019 and

7    2020 for services billed under CPT code 63685 and

8    63650 for patients treated under health insurance,

9    like Cigna?

10        A.   I don't know the answer to that either.

11        Q.   I believe we've already talked about

12   this, but I want to make sure.  You also do not

13   know how much the devices or implants used for

14   Mr. Lowe's procedure cost, correct?

15        A.   I don't know that from this ledger that

16   I'm looking at, and I don't know it from memory.

17        Q.   Generally speaking is there a difference

18   in cost between what Spine Center pays for a

19   device or implant and what is charged to the

20   patient?

21        A.   There's usually a stocking and a handling

22   fee, depending on how long an implant, we may be

23   holding an implant in inventory.  If we are buying

24   these in for their being stocked on a shelf to a

25   certain fee, then we will pass that fee on to the

Page 67

1  implant itself.

2      Q.  And in this case you do not know

3  specifically whether Mr. Lowe's implant was

4  already stocked or how it was obtained?

5      A.  Correct, I don't know that.

6      Q.  Does Spine Center Atlanta have more than

7  one vendor that it purchases spinal stimulators

8  from?

9      A.  Yes.

10      Q.  How many different vendors does Spine

11  Center Atlanta use to purchase spinal stimulators?

12      A.  It's varied, and I would say probably

13  there are three that we may purchase from from

14  time to time, depending on the appropriate device

15  for the specific patient.  There could be more or

16  less, it just depends.  We're going to try and get

17  the best device in for the remedy of the patient

18  or for the care of the patient.  So --

19      Q.  For devices billed under codes 63685 and

20  63650, how much did Spine Center pay for those

21  devices in 2019 and 2020?

22      A.  I don't know the answer to that.  I would

23  have to go beyond this ledger to determine that.

24      Q.  When Spine Center purchased the devices

25  that were installed for Mr. Lowe's stimulator, did

Case 1:20-cv-05224-CAP  Document 161  Filed 02/05/23  Page 68 of 104
30(b)(6) Daniel Lincoln          September 16, 2021
Lowe, Steven v. Difei Transport LLC

Page 68

1    Spine Center receive an invoice for purchase order

2    or receipt for those devices?

3         A.  Yes.

4         Q.  And that invoice, purchase order or

5    receipt is a document that Spine Center would

6    still be in possession of related to Mr. Lowe's

7    device?

8         A.  I would assume so.

9         Q.  That was installed in August of 2020,

10   would Spine Center still have possession of that

11   invoice or purchase order or receipt?

12        A.  I would assume so.  I don't know if a rep

13   brought it in and repped it or how -- or if we

14   bought it in.  I would have to look at that.  But

15   I assume there would be some document of what was

16   implanted in the patient, and thereby some

17   accounting thereof.

18        Q.  I believe we've already discussed this

19   related to Mr. Lowe's bill, but to your knowledge

20   has Spine Center sold or assigned its interest in

21   Mr. Lowe's treatment to any other entity?

22        A.  Not to my knowledge.

23        Q.  What percentage of overall bills does

24   Spine Center sell to -- sell or assign to other

25   entities or medical funding companies?

30(b)(6) Daniel Lincoln          September 16, 2021
Lowe, Steven v. Difei Transport LLC

Page 69

1        A.   I don't know the answer to that,

2   typically the answer.

3        Q.   Are there times when Spine Center sells

4   or assigns its interest in a letter of protection

5   to another entity?

6        A.   Yes, there are.

7        Q.   When that happens are those bills sold on

8   a patient-by-patient basis or are they ever

9   bundled and sold as a package?

10        A.   It's patient-by-patient, first of all,

11   and then a company could buy multiple patients, so

12   if you call that a bundle, they could be bundled.

13   But it's always patient-by-patient.

14        Q.   What are the typical entities that are

15   purchasing bills from Spine Center?

16             MS. LAWSON:  And just right now I would

17   just object to that question based upon a

18   potential confidential nature of those, just the

19   fact that we have -- Spine Center has an

20   agreement.  I will direct that the deponent may

21   answer your question, but I would just like to

22   have that confidentiality objection on the record.

23             MR. SESSIONS:  Sure.

24        A.   There are various entities that purchase

25   medical liens, and just depending on -- and we

Page 70

1  will sell our medical lien to various entities.

2  There's not one specific one that we work with,

3  and it just depends on terms, if you will, and it

4  depends on -- and we sell them just to keep the

5  business open and manage our cash flow.  So from

6  that standpoint it just depends on what our cash

7  needs may be and who may be at the door to

8  purchase our medical liens.

9          MR. SESSIONS:  And I'll give Ms. Lawson a

10 standing objection on the same grounds for all of

11 these questions related to these entities.

12         MS. LAWSON:  Yes, thank you.  Sorry,

13 Matt.  Thank you for that standing objection.

14 There may come a time, depending on what you ask,

15 I may direct the deponent not to answer your

16 question.

17         MR. SESSIONS:  Sure.

18 BY MR. SESSIONS:

19    Q.  What are some of the entities that you

20 are aware of that have purchased bills from Spine

21 Center in the last two years?

22    A.  Last two years is Well States, I'm aware

23 of them, and there's one other that I'm looking to

24 remember the name of.  But Well States is probably

25 the predominant.  Could also be GreenLink Funding,

Page 71

1    may have within the last two years.  And then --

2    those are the two that come to mind.

3         Q.  And do you say GreenLink Funding?

4         A.  Correct.

5         Q.  Who makes the decision at Spine Center to

6    sell one of these liens to a funding company?

7         A.  Typically Dr. Chappuis.

8         Q.  Are the value of these liens that are

9    purchased determined on a patient-by-patient basis

10   or does Spine Center have standing agreements with

11   entities like Well States or GreenLink?

12        A.  It's patient-by-patient.

13        Q.  Are you familiar with a third party

14   vendor known as Mighty Group?

15        A.  A legacy system, Mighty System, if that's

16   the same.  I'm familiar with the Mighty System.

17        Q.  And what is the Mighty System?

18        A.  That was a system, a data repository,

19   really, or a file share type of system.

20        Q.  Is that a system that Spine Center uses

21   to communicate with its patients?

22        A.  No.

23        Q.  What is that system?

24        A.  We don't use the system anymore.  Or we

25   don't use it.  So I'm not sure what it currently

Page 72

1  does.

2      Q.  When was the last time Spine Center did

3  use Mighty?

4      A.  I don't have an exact date.  I would say

5  probably 2018, maybe, or could be -- could have

6  been earlier than that, 2017.

7      Q.  Back when Spine Center was using Mighty,

8  what was the purpose behind it?  What was it used

9  for?

10      A.  It was used to share information that was

11  sharable over this platform between Spine Center

12  and I believe the law firms.

13      Q.  Are you familiar with what's called a

14  HIPAA business associate agreement?

15      A.  Yes.

16      Q.  Did Spine Center have a HIPAA business

17  associate agreement with Mighty Group back when it

18  was using their services?

19      A.  To my knowledge it was HIPAA-compliant,

20  and to my knowledge we would have had one.  I

21  don't have it in my hands, but typically that is

22  the -- that is the way these things are set up.

23      Q.  Are there any third party vendors who

24  have HIPAA business associate agreements that have

25  access to Mr. Lowe's file?

Page 73

1        A.   No, not to my knowledge.

2        Q.   Are you familiar with an entity known as

3   1800MedWrecks LLC?

4        A.   I'm familiar, yes.

5        Q.   What is your understanding of what is

6   1800MedWrecks LLC?

7        A.   I think it's also some kind of data share

8   or communication type of system.  I've never

9   personally used it so I'm not sure, but I think

10  that's something that it does, or that's what it's

11  for.

12             MR. SESSIONS:  We've been going now for

13  two hours.  Anybody interested in a five-minute

14  break?

15             THE WITNESS:  How much longer do you

16  think we'll go, before we take a five-minute

17  break?

18             MR. SESSIONS:  We're mostly finished.

19             THE WITNESS:  I would vote to get

20  through, then, before we take a break, unless

21  somebody needs a bio break.

22             MR. SESSIONS:  Yeah, I'm just checking

23  in.  Nothing?  Okay, all right, we'll carry on.

24  BY MR. SESSIONS:

25        Q.   I want to look at some more of the

1    documents Spine Center has produced in this case.

2    So I'm looking now at SCA17, which I believe is

3    also one of the tabs in your EMR software.  Do you

4    recognize this document?

5        A.  This is the data pulled from Centricity,

6    so I do recognize it as that, I believe.

7        Q.  Okay.

8        A.  Uh-huh.

9        Q.  I'm interested in this entry all the way

10   on the bottom, it's listed as July 12th, 2017,

11   imaging report, MRI lumbar spine.  Are you aware

12   if this document exists, this 2017 MRI report?

13       A.  I'm not aware, but there's a paper clip

14   in there so I would assume perhaps that it does,

15   or it would have been uploaded.

16       Q.  Is this a document that Spine Center

17   would be able to produce to me from their

18   software?

19       A.  I don't know the answer to that.  I can't

20   tell you that.  That would be an IT question.  And

21   this appears to me that maybe something that was

22   brought in from the outside from the patient as a

23   point of reference, just from the timeframe.  So I

24   don't know if that was on a disk, if we uploaded

25   it and were able to save it or if the file

Case 1:20-cv-05224-CAP  Document 161  Filed 02/05/23  Page 75 of 104
30(b)(6) Daniel Lincoln                    September 16, 2021
Lowe, Steven v. Difei Transport LLC

Page 75

1   transfer only took the event and not the actual

2   file.  I just don't know the answer to that.  That

3   would be my key question for me to clarify.

4        Q.  Understood.  But generally if there's a

5   paper clip associated with one of these entries

6   there is a document that is accessible, true?

7        A.  True, something like that.

8        Q.  Okay.  I'll look now at -- give me a

9   second to scroll here.  Is SCA109, starting with

10  this email from Sylvia Ramos to Stella Frederick

11  and Rashida Francis.  Are you familiar with this

12  email?

13       A.  Not specifically, but only in reviewing

14  the documents.

15       Q.  So at some point before this deposition

16  you've seen this email while reviewing the

17  documents in this case.  Is Stella Frederick a

18  Spine Center employee?

19       A.  Yes.

20       Q.  Is she employed with Spine Center?

21       A.  I believe so, although I'm not 100

22  percent sure.  I think she's out on medical leave,

23  that's why.  I'm just not 100 percent sure.

24       Q.  Sure.  Rashida Francis, is she a Spine

25  Center employee?

Page 76

```
 1        A.  Yes.

 2        Q.  Is she still employed with Spine Center?

 3        A.  As far as I know, yes.

 4        Q.  So, and this email goes on to two pages,

 5   so I'm happy to let you read -- why don't you go

 6   ahead and read this and then let me know when

 7   you're finished and I'll scroll to the next page

 8   and you can read the rest of the email as well and

 9   then we can discuss.

10        A.  Okay.  Okay.

11        Q.  So looking at this email, going back to

12   SCA-109, this is from Sylvia Ramos.  Do you know

13   who Sylvia Ramos is?

14        A.  I do not.

15        Q.  Okay.  Looking at her email address it

16   appears to be Sylvia.Ramos@MedWrecks.com.  She is

17   e-mailing to Spine Center employees and she

18   appears to be requesting that Spine Center draft a

19   surgical narrative relating to Steven Lowe's

20   treatment, is that true?

21        A.  Yes.

22        Q.  Was this email relayed to Dr. -- well,

23   let me ask you this:  You're aware that Dr. Adams

24   drafted the requested narrative?

25        A.  I'm not.
```

Page 77

1      Q.   Okay.  Well, I'm showing you now what's

2   labeled as SCA301 through 303.  Have you seen this

3   document before?

4      A.   Yes.

5      Q.   Okay.

6      A.   It's the summary of the patient's care.

7      Q.   So this appears to be a narrative drafted

8   by Dr. Adams, true?

9      A.   Yes.

10     Q.   Okay.  The email we were just looking at

11  requesting this narrative, was the body of that

12  email provided to Dr. Adams prior to his drafting

13  of this requested narrative?

14     A.   I don't know the answer to that.

15     Q.   While we're looking at Dr. Adams'

16  narrative, this is dated March 29th, 2021.

17     A.   Uh-huh.

18     Q.   Is that a yes?

19     A.   Yes, I'm sorry.

20     Q.   That's okay.  Do you know who wrote this

21  narrative?

22     A.   I don't.  But typically these would be

23  pulled from op notes or -- and if Dr. Adams has

24  signed it, I would assume Dr. Adams wrote this,

25  and typically it would be based on or -- this

Page 78

1    would be the patient record, what I would call the

2    patient record or the notes that are also in the

3    system.  So that's typically, I believe, what that

4    entails.

5         Q.  So it's your understanding that Dr. Adams

6    actually drafted this narrative?

7         A.  Again, I don't know exactly who did it.

8    He signed it and it starts out, I, Dr. Adams.  I

9    would assume that he put this together.  It could

10   have been an assistant, and he just read it and

11   signed it.  I don't know the answer to that.

12        Q.  Are there specific employees at Spine

13   Center who assist doctors in drafting narratives

14   like this?

15        A.  There are PAs, physician assistants or

16   helpers.  It could be that he asked one of them

17   that was working with Patient Lowe.  Again, I

18   don't know that specifically or witness that

19   specifically, to answer your question.

20        Q.  Do you know who Gidget Black is?

21        A.  Gidget Black?  No.

22        Q.  Yes.

23        A.  I don't.

24        Q.  So I'm showing you Page 21 of a

25   supplemental production from Spine Center.

30(b)(6) Daniel Lincoln                September 16, 2021
Lowe, Steven v. Difei Transport LLC

Page 79

```
 1   There's a --

 2        A.   Okay.

 3        Q.   -- there's a signature block for a Gidget

 4   Black.

 5        A.   Gigi, sorry.  I know her as Gigi.

 6        Q.   Gigi, okay.  Who is Gigi?

 7        A.   She's a nurse practitioner.  She's no

 8   longer with us.  So she's caring for a parent in

 9   another state, she had to move.  But she's no

10   longer with us.

11        Q.   Was it part of Gigi's job description to

12   help draft surgical narratives like the one we've

13   been discussing?

14        A.   If Dr. Adams asked her to do it, that

15   would have been something she would have helped

16   him with.  I don't know that it specifically

17   states that in her nurse practitioner job

18   description, but it would have been something she

19   would have done.

20        Q.   All right.  Scrolling down a page to 22

21   of the supplemental production, this little

22   appears to be a drafted surgical narrative.  Have

23   you seen this document before?

24        A.   I believe so, in the notes.

25        Q.   Okay.  The first line of this reads, I'm
```

30(b)(6) Daniel Lincoln                    September 16, 2021
Lowe, Steven v. Difei Transport LLC

Page 80

1    James L. Chappuis, MD and I have been continuously

2    licensed to practice medicine in the State of

3    Georgia since 1987.  Do you see that?

4         A.  Yes.

5         Q.  So this appears to be a narrative drafted

6    by Dr. Chappuis, true?

7         A.  Potentially.

8         Q.  Are you aware of any differences between

9    this narrative and the one signed by Dr. Adams

10   that we were looking at a few minutes ago?

11        A.  Am I aware of any differences?

12        Q.  Yes.

13        A.  Well, the first paragraph is different.

14        Q.  Okay.  Other than the first paragraph

15   which lays out the medical qualifications of the

16   two doctors, any other differences?

17        A.  I would have to look at them.  I don't

18   know that, just committed to memory.

19        Q.  Okay.  And you don't have any knowledge

20   of how or when these two narratives were drafted,

21   true?

22        A.  That's correct, I don't.

23        Q.  Any idea why there would be a narrative

24   from both Dr. Chappuis and Dr. Adams for

25   Mr. Lowe's treatment?

30(b)(6) Daniel Lincoln                    September 16, 2021
Lowe, Steven v. Difei Transport LLC

                                                    Page 81

1          A.  I don't.  I don't know.  I could only

2     imagine that there's some template or they started

3     with some template with -- and the first

4     paragraphs are, you know, one Dr. Chappuis and one

5     is Dr. Adams.  I don't know.  That's what I would

6     assume, but I don't know specifically to answer

7     your question.

8               MR. McEVOY:  I requested one, a narrative

9     from Dr. Chappuis and from Dr. Adams.  That's how

10    there's two of them.

11              MR. SESSIONS:  Mr. McEvoy, was that you?

12    Sorry, I can't see you.

13              MR. McEVOY:  Yeah, that's me.

14    BY MR. SESSIONS:

15         Q.  Bear with me on for a second while I

16    scroll.  All right.  Looking at page 44 of Spine

17    Center's supplemental production, there's an email

18    from Satonia Thomas to a Melyssa Sanchez.  Do you

19    see this?

20         A.  Yes.

21         Q.  And it looks like Ms. Thomas was reaching

22    out to schedule a deposition from Dr. Adams.  Do

23    you see that?

24         A.  Yes.

25         Q.  Then looking at page -- the bottom of

Page 82

1   page 43 from Spine Center's production there's

2   another email from Ms. Thomas to Melyssa Sanchez

3   indicating that Ms. Thomas would also like to

4   schedule a 30-minute conference between Dr. Adams

5   and the attorney prior to the deposition.  Do you

6   see that?

7        A.  Yes.

8        Q.  This is page 39 of the supplemental

9   production.  Are you familiar with this document?

10       A.  Yes.

11       Q.  Okay.  This appears to be a charge sheet

12   or a price sheet for Dr. Adams' testimony.

13       A.  Correct.

14       Q.  So it's my understanding that Dr. Adams

15   is being paid by plaintiffs attorney both for the

16   deposition itself and for a predeposition

17   conference pursuant to this fee schedule.

18       A.  Yes, I would -- yes.

19            MR. SESSIONS:  All right, Mr. Lincoln.

20   That's all the questions I have at the moment.

21   I'm going to, for my purposes, suspend this

22   deposition at this time based on inability to

23   answer some enumerated topics that were included

24   with the notice, and we can have further

25   discussion with your counsel afterwards, but for

Page 83

1   my purposes currently I'm finished for the day,

2   but I'm suspending the deposition on those

3   grounds.

4          MR. McEVOY:  What are those topics?

5          MR. SESSIONS:  Sure.  Let me get the

6   notice so I can correspond them to topic numbers.

7          So the first one is topic 11, the number

8   of patients and percent of patients currently

9   receiving treatment from Spine Center Atlanta on a

10  contingency or lien basis.

11         MS. LAWSON:  And I think the witness said

12  that he did not know and there was no way that

13  Spine Center actually creates or keeps that data.

14         MR. SESSIONS:  Kas, I understand his

15  answer, and we can discuss further off the record.

16         The next one is topic 13, the reasonable

17  and necessary medical bills which are customary in

18  the medical field for the types of services

19  rendered to plaintiff Steven Lowe by Spine Center,

20  and all of those subtopics.

21         Additionally, topic 18, Spine Center

22  Atlanta's average recovery percentage of its total

23  amount billed for all patients who are treated on

24  a lien.  And topic 24, the documents produced by

25  Spine Center Atlanta to defendants specifically

30(b)(6) Daniel Lincoln          September 16, 2021
Lowe, Steven v. Difei Transport LLC

Page 84

1   involving the drafting of the two medical

2   narratives, one from Dr. Chappuis, one from

3   Dr. Adams.

4           MR. McEVOY:  I don't understand.

5           MR. SESSIONS:  What do you not

6   understand?

7           MR. McEVOY:  Well, I mean, they're

8   produced -- the documents have been produced as a

9   part of the -- you went over them.

10          MR. SESSIONS:  Sure.  Mr. Lincoln did not

11  have any knowledge of who actually drafted those

12  documents.

13          MR. McEVOY:  All right.

14          MR. SESSIONS:  That's it.

15          MR. McEVOY:  Okay.

16                  EXAMINATION

17  BY MR. McEVOY:

18      Q.  Mr. Lincoln, I have some questions for

19  you.

20      A.  Sure.

21      Q.  I'm going to show you -- first of all,

22  it's going to be a little bit repetitive,

23  unfortunately, just because of the mechanics of

24  how this was noticed.  But if you would introduce

25  yourself to the jury, please.

Page 85

1      A.   My name is Daniel Lincoln.  I work for
2  Spine Center Atlanta in practice management.
3      Q.   And what does that mean, practice
4  management?
5      A.   I do operations management and
6  nonclinical business operations.
7      Q.   And it's my understanding you're here
8  today as a corporate representative of Spine
9  Center Atlanta?
10      A.   Correct.
11      Q.   And with reference to the medical care
12  and treatment provided to one of your patients,
13  Steven Lowe?
14      A.   Correct.
15      Q.   And you are familiar with the billing
16  records associated with the bills for the medical
17  treatment and services rendered to Steven Lowe
18  following the subject collision involved in this
19  case?
20      A.   Yes.
21          (Plaintiff's Exhibit 1 marked)
22  BY MR. McEVOY:
23      Q.   All right.  I'm going to show you -- do
24  you see my screen?  Can you see this?  I'm sorry,
25  I can't hear you.

Page 86

1        A.   No, I can't see it yet.  There we go.

2        Q.   Here we go.  So this was produced by

3   Spine Center, the first page of this record,

4   custodian's affidavit, and then following it is

5   the patient ledger for Steven Lowe, you're

6   familiar with this document.

7        A.   Yes.

8        Q.   Can you tell us what the total amount

9   that was charged to Mr. Lowe for the medical care

10  and treatment and services provided by Spine

11  Center to him following this collision?

12       A.   Yes, $203,029.56.

13       Q.   And this ledger is a true and accurate

14  copy of the charges associated with that medical

15  treatment and service es rendered to Mr. Lowe

16  following the collision?

17       A.   Yes, it is.

18       Q.   Are these charges taken from your master

19  charge list for the Spine Center?

20       A.   Yes, they are.

21       Q.   Are the charges that the Spine Center --

22  if you could, just explain to the jury what a

23  master charge list is.

24       A.   So a chargemaster is the amounts that are

25  charged for specific CPT codes, specific CPT codes

30(b)(6) Daniel Lincoln                    September 16, 2021
Lowe, Steven v. Difei Transport LLC

Page 87

1    have specific definitions and governance in the

2    way that they can be used and/or billed, and those

3    are used universally across the medical field.

4    And then, too, those codes are certain diagnoses

5    codes or other codes and descriptions that then

6    determine how they can be used, and the

7    chargemaster is the amount of money that you

8    assign to that CPT code and the other parameters

9    that may be involved to make up your billed

10   charges for the care that you're providing to a

11   patient.

12       Q.  Are the charges that are set forth in

13   Spine Center's chargemaster, are they within the

14   range of reasonable and customary charges for each

15   of those codes?

16       A.  The usual and customary amount for the

17   care that's provided is typically our benchmark.

18   There may be some exceptions to that, but

19   typically we are charging for the type of care

20   that we're providing and the geography that we

21   provide it, we are billing usual and customary

22   amounts for the care that we provide.

23       Q.  In reviewing the list of charges

24   reflected in this ledger we just -- I'll mark it

25   as Exhibit 1, if I didn't already -- are the

30(b)(6) Daniel Lincoln                    September 16, 2021
Lowe, Steven v. Difei Transport LLC

Page 88

1    charges reflected in this ledger of charges for

2    the medical treatment and services rendered to

3    Steven Lowe in this case within the range of

4    customary and normal reasonable charges for those

5    services?

6         A.  I would answer yes, since the basis for

7    the chargemaster that we bill are typically within

8    that range.  So therefore the sum would typically

9    be within that range for the volume of care or the

10   time that we've cared for him and whatever the

11   treatment that he would have received.

12        Q.  In this case the defendant trucking

13   company has admitted to causing this collision

14   involving Mr. Lowe.  Does Spine Center take issue

15   with the fact that Mr. Lowe wants the trucking

16   company to pay for these medical bills, as opposed

17   to himself or some other entity or company?

18             MR. SESSIONS:  Object to the form.  You

19   can answer.

20        A.  No, we don't take any issue with that.

21   We are caring for the patient and would seek to be

22   paid for the care we've provided.

23   BY MR. McEVOY:

24        Q.  And you understand as a citizen of the

25   state of Georgia and the American citizen that our

Page 89

1    justice system is designed in such a way that if

2    someone hits with you a tractor-trailer and

3    injures you and causes you to incur medical bills

4    that you're entitled by law to seek compensation,

5    including payment of those medical bills from

6    that, in this case trucking company, that would

7    have hit Mr. Lowe.  You understand that, correct?

8         MR. SESSIONS:  Object to the form.

9         A.  I do.

10   BY MR. McEVOY:

11        Q.  Can you reanswer it?  He spoke at the

12   same time.

13        A.  Yes, I do understand that.

14        Q.  And it's my understanding that it's not

15   unusual for patients in your practice to pay for

16   their services not directly themselves, but

17   someone has actually hurt them and that person or

18   entity that hurt them is the one ultimately paying

19   your bills.

20        A.  For those patients that come in that way,

21   yes.

22        Q.  Would it be fair to say that it's up to

23   the patient to determine whether they want to

24   attempt to use some kind of their own insurance or

25   whether they want to try and attempt to get

Page 90

1    someone who's responsible for their injuries to

2    make payments for these bills?

3          A.   It's always the patient choice.

4          Q.   Is it unusual for your physicians in the

5    practice to generate medical narratives at the

6    request of your patients or their attorneys?

7          A.   No, it's not unusual at all.

8               MR. McEVOY:  All right.  That's all I

9    have for you.

10              THE WITNESS:  Thank you.

11              MR. SESSIONS:  Nothing further from me at

12   this time.

13              MR. McEVOY:  All right.  Well, we may see

14   you again, we may not, Mr. Lincoln, take care.

15              THE WITNESS:  Thank you.

16              THE VIDEOGRAPHER:  This concludes Volume

17   1 to the videotaped deposition.  This time is

18   approximately 4:31 p.m. we're off the record.

19              (Deposition concluded at 4:31 p.m.)

20              (Defendants' Exhibit 1 marked)

21              (Signature reserved)

22

23

24

25

Page 91

1                    CERTIFICATE
    STATE OF GEORGIA:
2   COUNTY OF FULTON:
                I hereby certify that the foregoing
3   transcript was taken down, as stated in the caption,
    and the colloquies, questions and answers were
4   reduced to typewriting under my direction; that the
    transcript is a true and correct record of the
5   evidence given upon said proceeding.
                I further certify that I am not a relative
6   or employee or attorney of any party, nor am I
    financially interested in the outcome of this
7   action.
                I have no relationship of interest in this
8   matter which would disqualify me from maintaining my
    obligation of impartiality in compliance with the
9   Code of Professional Ethics.
                I have no direct contract with any party
10  in this action and my compensation is based solely
    on the terms of my subcontractor agreement.
11              Nothing in the arrangements made for this
    proceeding impacts my absolute commitment to serve
12  all parties as an impartial officer of the court.
13              This the 1st day of October 2021.
14
15

16  _____
    Valerie Almand, CRR, RPR, CRC, B-531
17
18
19
20
21
22
23
24
25

30(b)(6) Daniel Lincoln                         September 16, 2021
Lowe, Steven v. Difei Transport LLC

Page 92

1                   VERITEXT LEGAL SOLUTIONS
              FIRM CERTIFICATE AND DISCLOSURE
2
         Veritext represents that the foregoing
3    transcript as produced by our Production
     Coordinators, Georgia Certified Notaries, is a true,
4    correct and complete transcript of the colloquies,
     questions and answers as submitted by the certified
5    court reporter in this case.  Veritext further
     represents that the attached exhibits, if any, are a
6    true, correct and complete copy as submitted by
     the certified reporter, attorneys or witness in this
7    case, and that the exhibits were handled and
     produced exclusively through our Production
8    Coordinators, Georgia Certified Notaries. Copies of
     notarized production certificates related to this
9    proceeding are available upon request to
     litsup-ga@veritext.com.
10       Veritext is not taking this deposition under any
     relationship that is prohibited by OCGA
11   15-14-37(a)and(b).  Case-specific discounts are
     automatically applied to all parties, at such time
12   as any party receives a discount. Ancillary services
     such as calendar and financial reports are available
13   to all parties upon request.
14
15
16
17
18
19
20
21
22
23
24
25

Page 93

1    TO: Kassandra Lawson, Esquire

2    Re: Signature of Deponent Daniel Lincoln

3    Date Errata due back at our offices: 30 Days

4

5    Greetings:  The deponent has reserved the right to
     read and sign.  Please have the deponent review the

6    attached PDF transcript, noting any changes or
     corrections on the attached PDF Errata.  The

7    deponent may fill out the Errata electronically or
     print and fill out manually.

8

     Once the Errata is signed by the deponent and

9    notarized, please mail it to the offices of Veritext
     (below).

10

     When the signed Errata is returned to us, we will

11   seal and forward to the taking attorney to file with
     the original transcript.  We will also send copies

12   of the Errata to all ordering parties.

13   If the signed Errata is not returned within the time
     above, the original transcript may be filed with the

14   Court without the signature of the deponent.

15   Please send completed Errata to:

16   Veritext Production Facility

17   20 Mansell Court

18   Suite 300

19   Roswell, GA 30076

20   770-343-9696

21

22

23

24

25

30(b)(6) Daniel Lincoln                    September 16, 2021
Lowe, Steven v. Difei Transport LLC

                                                      Page 94

1    ERRATA
2    I, the undersigned, do hereby certify that I have
     read the transcript of my testimony, and that
3
4    ___ There are no changes noted.
5    ___ The following changes are noted:
6    Pursuant to Rule 30(7)(e) of the Federal Rules of
     Civil Procedure and/or OCGA 9-11-30(e), any changes
7    in form or substance which you desire to make to
     your testimony shall be entered upon the deposition
8    with a statement of the reasons given for making
     them.  To assist you in making any such corrections,
9    please use the form below.  If additional pages are
     necessary, please furnish same and attach.
10
     Page _____ Line _____
11   Change_____
     _____
12
     Page _____ Line _____
13   Change_____
     _____
14
     Page _____ Line _____
15   Change_____
     _____
16
     Page _____ Line _____
17   Change_____
     _____
18
     Page _____ Line _____
19   Change_____
     _____
20
     Page _____ Line _____
21   Change_____
     _____
22
     Page _____ Line _____
23   Change_____
     _____
24
25

30(b)(6) Daniel Lincoln                    September 16, 2021
Lowe, Steven v. Difei Transport LLC

Page 95

1    Page _____ Line _____
     Change_____
2    _____
3    Page _____ Line _____
     Change_____
4    _____
5    Page _____ Line _____
     Change_____
6    _____
7    Page _____ Line _____
     Change_____
8    _____
9    Page _____ Line _____
     Change_____
10   _____
11   Page _____ Line _____
     Change_____
12   _____
13   Page _____ Line _____
     Change_____
14   _____
15   Page _____ Line _____
     Change_____
16   _____
17   Page _____ Line _____
     Change_____
18   _____
19   Page _____ Line _____
     Change_____
20   _____
21          DEPONENT'S SIGNATURE
22     Sworn to and subscribed before me this ___ day of
     _____, _____.
23

          _____
24        NOTARY PUBLIC
25        My Commission Expires:_____

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

## RECORDS CUSTODIAN'S AFFIDAVIT AND DECLARATION

I, the undersigned, hereby certify that I am a duly authorized custodian of records for **Spine Center Atlanta - Corporate,** and I have authority to certify said records and copies thereof. Further, I hereby certify that the copies of records attached hereto are true and accurate copies of the records of **Steven M. Lowe,** and comprise <u>ALL</u> records and notes on **Steven M. Lowe** for <u>ALL</u> dates of treatment for <u>ALL</u> injuries, illnesses, incidents, or accidents which **Steven M. Lowe** received treatment at this facility.

I hereby certify in compliance with O.C.G.A. §§ 24-8-803(6) and 24-9-902(11) that these records:

a) Were made at or near the time of the described acts, events, conditions, opinions, or diagnoses set forth by or from information transmitted by a person with knowledge of such matters;
b) Were kept in the course of your regularly conducted business activity;
c) Were made as the regular practice of your regularly conducted business activity; and
d) Were made by or from information transmitted by a person with personal knowledge and a business duty to report.

This 2ⁿᵈ day of November, 2020

_____
Records Custodian

Naleisha Fulford
PRINT NAME

Sworn to and subscribed before me this
2nd day of November , 2020

_____
(NOTARY PUBLIC)

My Commission Expires:
7-15-22

**EXHIBIT**

P1

# Patient Ledger

| Patient ID: | Steven Lowe | Total Charges: | $203,029.56 |
| Birthdate: | 525 Lake Court Drive | Total Payments: | $0.00 |
| Phone 1: | Mcdonough GA  30523 | Total Adjustments: | $0.00 |
| Phone 2: | | Insurance Balance: | $203,029.56 |
| | | Patient Balance: | $0.00 |

| Visit | Company | | Provider | Facility | Ticket Number | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Service | Code | Description | | | | Units | Fee | Insurance | Patient |
| 07/02/2019 | SpineCenterAtlanta South | | Forte NP-C, Sharonda | SCA South - Stockbridge | 278705 | | | | |
| | M48.04 | Spinal stenosis, thoracic region | | | | | | | |
| | M53.82 | Other specified dorsopathies, cervical region | | | | | | | |
| 07/02/2019 | 99203 | Detailed | | | | 1.00 | $600.00 | $600.00 | $0.00 |
| | | | | Visit Total/Balance Due | | | | $600.00 | $0.00 |
| 07/16/2019 | SpineCenterAtlanta South | | Patnubay ATC, Gilbert | SCA South - Forest Park | 280720 | | | | |
| | M54.2 | Cervicalgia | | | | | | | |
| | M54.5 | Low back pain | | | | | | | |
| | S13.4XXA | Sprain of ligaments of cervical spine, initial encounter | | | | | | | |
| | S33.5XXA | Sprain of ligaments of lumbar spine, initial encounter | | | | | | | |
| 07/16/2019 | 97162 | Physical therapy evaluation; moderate complexity, requiring these components: A history of present problem with 1-2 personal factors and/or comorbidities that impact the plan of care; An examination of body systems using standardized tests and measures in | | | | 1.00 | $225.00 | $225.00 | $0.00 |
| 07/16/2019 | 97110 | Therapeutic exercise 15min | | | | 2.00 | $200.20 | $200.20 | $0.00 |
| | | | | Visit Total/Balance Due | | | | $425.20 | $0.00 |
| 07/16/2019 | SpineCenterAtlanta South | | Jones DPT,  Constance | SCA South - Forest Park | 280730 | | | | |
| | M54.2 | Cervicalgia | | | | | | | |
| | M54.5 | Low back pain | | | | | | | |
| 07/16/2019 | 97124 | Massage Therapy 15 min | | | | 4.00 | $252.40 | $252.40 | $0.00 |
| | | | | Visit Total/Balance Due | | | | $252.40 | $0.00 |
| 07/26/2019 | SpineCenterAtlanta South | | Coleman CMT, Sheldon | SCA South - Forest Park | 282316 | | | | |
| | M54.2 | Cervicalgia | | | | | | | |
| | M54.5 | Low back pain | | | | | | | |
| 07/26/2019 | 97124 | Massage Therapy 15 min | | | | 4.00 | $235.72 | $235.72 | $0.00 |
| | | | | Visit Total/Balance Due | | | | $235.72 | $0.00 |
| 08/09/2019 | SpineCenterAtlanta South | | Coleman CMT, Sheldon | SCA South - Forest Park | 284329 | | | | |
| | M54.2 | Cervicalgia | | | | | | | |
| | M54.5 | Low back pain | | | | | | | |
| 08/09/2019 | 97124 | Massage Therapy 15 min | | | | 4.00 | $235.72 | $235.72 | $0.00 |
| | | | | Visit Total/Balance Due | | | | $235.72 | $0.00 |
| 08/09/2019 | SpineCenterAtlanta South | | Patnubay ATC, Gilbert | SCA South - Forest Park | 284336 | | | | |
| | M54.2 | Cervicalgia | | | | | | | |
| | M54.5 | Low back pain | | | | | | | |
| 08/09/2019 | 97110 | Therapeutic exercise 15min | | | | 2.00 | $200.20 | $200.20 | $0.00 |
| | | | | Visit Total/Balance Due | | | | $200.20 | $0.00 |
| 08/30/2019 | SpineCenterAtlanta South | | Forte NP-C, Sharonda | SCA South - Forest Park | 287166 | | | | |
| | M54.5 | Low back pain | | | | | | | |
| | M48.02 | Spinal stenosis, cervical region | | | | | | | |
| 08/30/2019 | 99214 | Detailed Office Visit 25 min | | | | 1.00 | $650.00 | $650.00 | $0.00 |
| | | | | Visit Total/Balance Due | | | | $650.00 | $0.00 |
| 08/30/2019 | SpineCenterAtlanta South | | Coleman CMT, Sheldon | SCA South - Forest Park | 287274 | | | | |
| | M54.2 | Cervicalgia | | | | | | | |
| | M54.5 | Low back pain | | | | | | | |
| 08/30/2019 | 97124 | Massage Therapy 15 min | | | | 4.00 | $235.72 | $235.72 | $0.00 |
| | | | | Visit Total/Balance Due | | | | $235.72 | $0.00 |
| 08/30/2019 | SpineCenterAtlanta South | | Patnubay ATC, Gilbert | SCA South - Forest Park | 287285 | | | | |

| Patient ID: | | | Steven Lowe | | | Total Charges: | | | $203,029.56 |
| Birthdate: | | | 525 Lake Court Drive | | | Total Payments: | | | $0.00 |
| Phone 1: | | | Mcdonough GA  30523 | | | Total Adjustments: | | | $0.00 |
| Phone 2: | | | | | | Insurance Balance: | | | $203,029.56 |
| | | | | | | Patient Balance: | | | $0.00 |

| Visit | Company | | Provider | Facility | Ticket Number | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Service | Code | Description | | | | Units | Fee | Insurance | Patient |
| | M54.2 | Cervicalgia | | | | | | | |
| | M54.5 | Low back pain | | | | | | | |
| 08/30/2019 | | 97110 | Therapeutic exercise 15min | | | 2.00 | $200.20 | $200.20 | $0.00 |
| | | | | Visit Total/Balance Due | | | | $200.20 | $0.00 |
| 09/06/2019 | SpineCenterAtlanta South | | Forte NP-C, Sharonda | SCA South - Forest Park | 288006 | | | | |
| | | | | Visit Total/Balance Due | | | | | $0.00 |
| 10/28/2019 | Atlanta Orthopaedic Surg Center | | Adams MD, Brian D | Atlanta Orthopaedic Surgery Center | 294755 | | | | |
| | M25.51 | Pain in shoulder | | | | | | | |
| 10/28/2019 | 20610 | Major Joint | | | | 1.00 | $509.32 | $509.32 | $0.00 |
| | | | | Visit Total/Balance Due | | | | $509.32 | $0.00 |
| 10/28/2019 | Atlanta Orthopaedic Surg Center | | Adams MD, Brian D | Atlanta Orthopaedic Surgery Center | 295680 | | | | |
| | M25.51 | Pain in shoulder | | | | | | | |
| 10/28/2019 | 20610 | Major Joint | | | | 1.00 | $509.32 | $509.32 | $0.00 |
| | | | | Visit Total/Balance Due | | | | $509.32 | $0.00 |
| 11/12/2019 | SpineCenterAtlanta South | | Forte NP-C, Sharonda | SCA South - Forest Park | 296354 | | | | |
| | M48.04 | Spinal stenosis, thoracic region | | | | | | | |
| | M48.02 | Spinal stenosis, cervical region | | | | | | | |
| | M50.30 | Other cervical disc degeneration, unspecified cervical region | | | | | | | |
| 11/12/2019 | 99214 | Detailed Office Visit 25 min | | | | 1.00 | $650.00 | $650.00 | $0.00 |
| | | | | Visit Total/Balance Due | | | | $650.00 | $0.00 |
| 12/04/2019 | Orthopaedic & Spine Surgery of Atlant | | Adams MD, Brian D | Atlanta Orthopaedic Surgery Center | 298435 | | | | |
| | M47.817 | Spondylosis without myelopathy or radiculopathy, lumbosacral region | | | | | | | |
| 12/04/2019 | 64493 | INJECTION(S), DIAGNOSTIC OR THERAPEUTIC AGENT, PARAVERTEBRAL FACET (ZYGAPOPHYSEAL) JOINT (OR NERVES INNERVATING THAT JOINT) WITH IMAGE GUIDANCE (FLUOROSCOPY OR CT), LUMBAR OR SACRAL; SINGLE LEVEL | | | | 1.00 | $3,112.77 | $3,112.77 | $0.00 |
| 12/04/2019 | 64494 | INJECTION(S), DIAGNOSTIC OR THERAPEUTIC AGENT, PARAVERTEBRAL FACET (ZYGAPOPHYSEAL) JOINT (OR NERVES INNERVATING THAT JOINT) WITH IMAGE GUIDANCE (FLUOROSCOPY OR CT), LUMBAR OR SACRAL; SECOND LEVEL (LIST SEPARATELY IN ADDITION TO CODE FOR PRIMARY PROCEDURE | | | | 1.00 | $1,473.15 | $1,473.15 | $0.00 |
| | | | | Visit Total/Balance Due | | | | $4,585.92 | $0.00 |
| 12/04/2019 | Atlanta Orthopaedic Surg Center | | Adams MD, Brian D | Atlanta Orthopaedic Surgery Center | 300683 | | | | |
| | M47.817 | Spondylosis without myelopathy or radiculopathy, lumbosacral region | | | | | | | |
| 12/04/2019 | 64493 | INJECTION(S), DIAGNOSTIC OR THERAPEUTIC AGENT, PARAVERTEBRAL FACET (ZYGAPOPHYSEAL) JOINT (OR NERVES INNERVATING THAT JOINT) WITH IMAGE GUIDANCE (FLUOROSCOPY OR CT), LUMBAR OR SACRAL; SINGLE LEVEL | | | | 1.00 | $4,389.01 | $4,389.01 | $0.00 |
| 12/04/2019 | 64494 | INJECTION(S), DIAGNOSTIC OR THERAPEUTIC AGENT, PARAVERTEBRAL FACET (ZYGAPOPHYSEAL) JOINT (OR NERVES INNERVATING THAT JOINT) WITH IMAGE GUIDANCE (FLUOROSCOPY OR CT), LUMBAR OR SACRAL; SECOND LEVEL (LIST SEPARATELY IN ADDITION TO CODE FOR PRIMARY PROCEDURE | | | | 1.00 | $2,077.14 | $2,077.14 | $0.00 |
| | | | | Visit Total/Balance Due | | | | $6,466.15 | $0.00 |
| 12/04/2019 | Orthopaedic & Spine Surgery of Atlant | | Pham MD, Ngan | Atlanta Orthopaedic Surgery Center | 300684 | | | | |
| | M47.817 | Spondylosis for diagnostic or therapeutic nerve blocks and injections (when block or injection is performed by a different provider); prone position | | | | | | | |
| 12/04/2019 | 01992 | Anesthesia for diagnostic or therapeutic nerve blocks and injections (when block or injection is performed by a different provider); prone position | | | | 1.00 | $630.00 | $630.00 | $0.00 |
| | | | | Visit Total/Balance Due | | | | $630.00 | $0.00 |
| 12/09/2019 | SpineCenterAtlanta South | | Forte NP-C, Sharonda | SCA South - Forest Park | 300024 | | | | |
| 12/09/2019 | MISSAPPT | Missed Appointment Fee | | | | 1.00 | $30.00 | $30.00 | $0.00 |
| | | | | Visit Total/Balance Due | | | | $30.00 | $0.00 |
| 12/16/2019 | SpineCenterAtlanta South | | Forte NP-C, Sharonda | SCA South - Forest Park | 301344 | | | | |
| | M51.36 | Other intervertebral disc degeneration, lumbar region | | | | | | | |
| | M62.40 | Contracture of muscle, unspecified site | | | | | | | |

| Patient ID: | | Steven Lowe | | | Total Charges: | | $203,029.56 |
|---|---|---|---|---|---|---|---|
| Birthdate: | | 525 Lake Court Drive | | | Total Payments: | | $0.00 |
| Phone 1: | | Mcdonough GA  30523 | | | Total Adjustments: | | $0.00 |
| Phone 2: | | | | | Insurance Balance: | | $203,029.56 |
| | | | | | Patient Balance: | | $0.00 |

| Visit | Company | | Provider | Facility | | Ticket Number | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Service | Code | Description | | | | | Units | Fee | Insurance | Patient |
| | M50.30 | Other cervical disc degeneration, unspecified cervical region | | | | | | | | |
| | M54.2 | Cervicalgia | | | | | | | | |
| 12/16/2019 | 99214 | Detailed Office Visit 25 min | | | | | 1.00 | $650.00 | $650.00 | $0.00 |
| | | | | Visit Total/Balance Due | | | | | $650.00 | $0.00 |
| 01/06/2020 | Orthopaedic & Spine Surgery of Atlant | | Adams MD, Brian D | Atlanta Orthopaedic Surgery Center | | 303267 | | | | |
| | M47.817 | Spondylosis without myelopathy or radiculopathy, lumbosacral region | | | | | | | | |
| 01/06/2020 | 64635 | RFA Lumbar/Sacral Facet | | | | | 1.00 | $4,340.03 | $4,340.03 | $0.00 |
| 01/06/2020 | 64636 | RFA Lumbar/Sacral ADDL Facet Joint | | | | | 1.00 | $1,982.34 | $1,982.34 | $0.00 |
| | | | | Visit Total/Balance Due | | | | | $6,322.37 | $0.00 |
| 01/06/2020 | Atlanta Orthopaedic Surg Center | | Adams MD, Brian D | Atlanta Orthopaedic Surgery Center | | 303882 | | | | |
| | M47.817 | Spondylosis without myelopathy or radiculopathy, lumbosacral region | | | | | | | | |
| 01/06/2020 | 64635 | RFA Lumbar/Sacral Facet | | | | | 1.00 | $6,119.44 | $6,119.44 | $0.00 |
| 01/06/2020 | 64636 | RFA Lumbar/Sacral ADDL Facet Joint | | | | | 1.00 | $2,795.10 | $2,795.10 | $0.00 |
| | | | | Visit Total/Balance Due | | | | | $8,914.54 | $0.00 |
| 01/06/2020 | Orthopaedic & Spine Surgery of Atlant | | Pham MD, Ngan | Atlanta Orthopaedic Surgery Center | | 303883 | | | | |
| | M47.817 | Spondylosis without myelopathy or radiculopathy, lumbosacral region | | | | | | | | |
| 01/06/2020 | 01992 | Anesthesia for diagnostic or therapeutic nerve blocks and injections (when block or injection is performed by a different provider); prone position | | | | | 1.00 | $630.00 | $630.00 | $0.00 |
| | | | | Visit Total/Balance Due | | | | | $630.00 | $0.00 |
| 01/22/2020 | Orthopaedic & Spine Surgery of Atlant | | Adams MD, Brian D | Atlanta Orthopaedic Surgery Center | | 304168 | | | | |
| | M54.12 | Radiculopathy, cervical region | | | | | | | | |
| 01/22/2020 | 64483 | Injection, anesthetic agent and/or steroid, transforaminal epidural; lumbar or sacral, single level | | | | | 1.00 | $3,272.70 | $3,272.70 | $0.00 |
| | | | | Visit Total/Balance Due | | | | | $3,272.70 | $0.00 |
| 01/22/2020 | Atlanta Orthopaedic Surg Center | | Adams MD, Brian D | Atlanta Orthopaedic Surgery Center | | 306847 | | | | |
| | M54.12 | Radiculopathy, cervical region | | | | | | | | |
| 01/22/2020 | 62321 | Injection(s), of diagnostic or therapeutic substance(s) (eg, anesthetic, antispasmodic, opioid, steroid, other solution), not including neurolytic substances, including needle or catheter placement, interlaminar epidural or subarachnoid, cervical or thora | | | | | 1.00 | $3,483.90 | $3,483.90 | $0.00 |
| | | | | Visit Total/Balance Due | | | | | $3,483.90 | $0.00 |
| 01/28/2020 | Orthopaedic & Spine Surgery of Atlant | | Pham MD, Ngan | Atlanta Orthopaedic Surgery Center | | 306848 | | | | |
| | M54.12 | Radiculopathy, cervical region | | | | | | | | |
| 01/22/2020 | 01992 | Anesthesia for diagnostic or therapeutic nerve blocks and injections (when block or injection is performed by a different provider); prone position | | | | | 1.00 | $630.00 | $630.00 | $0.00 |
| | | | | Visit Total/Balance Due | | | | | $630.00 | $0.00 |
| 01/28/2020 | Orthopaedic & Spine Surgery of Atlant | | Pham MD, Ngan | Atlanta Orthopaedic Surgery Center | | 306849 | | | | |
| | M54.12 | Radiculopathy, cervical region | | | | | | | | |
| 01/22/2020 | 01992 | Anesthesia for diagnostic or therapeutic nerve blocks and injections (when block or injection is performed by a different provider); prone position | | | | | 1.00 | $630.00 | $630.00 | $0.00 |
| | | | | Visit Total/Balance Due | | | | | $630.00 | $0.00 |
| 01/28/2020 | Atlanta Orthopaedic Surg Center | | Adams MD, Brian D | Atlanta Orthopaedic Surgery Center | | 306850 | | | | |
| | M54.12 | Radiculopathy, cervical region | | | | | | | | |
| 01/22/2020 | 62321 | Injection(s), of diagnostic or therapeutic substance(s) (eg, anesthetic, antispasmodic, opioid, steroid, other solution), not including neurolytic substances, including needle or catheter placement, interlaminar epidural or subarachnoid, cervical or thora | | | | | 1.00 | $3,483.90 | $3,483.90 | $0.00 |
| | | | | Visit Total/Balance Due | | | | | $3,483.90 | $0.00 |
| 01/22/2020 | Orthopaedic & Spine Surgery of Atlant | | Adams MD, Brian D | Atlanta Orthopaedic Surgery Center | | 306851 | | | | |
| | M54.12 | Radiculopathy, cervical region | | | | | | | | |
| 01/22/2020 | 62321 | Injection(s), of diagnostic or therapeutic substance(s) (eg, anesthetic, antispasmodic, opioid, steroid, other solution), not including neurolytic substances, including needle or catheter placement, interlaminar epidural or subarachnoid, cervical or thora | | | | | 1.00 | $2,470.85 | $2,470.85 | $0.00 |

| Patient ID: | | | | Total Charges: | $203,029.56 |
|---|---|---|---|---|---|
| Birthdate: | | Steven Lowe | | Total Payments: | $0.00 |
| Phone 1: | | 525 Lake Court Drive | | Total Adjustments: | $0.00 |
| Phone 2: | | Mcdonough GA  30523 | | Insurance Balance: | $203,029.56 |
| | | | | Patient Balance: | $0.00 |

| Visit | Company | Provider | Facility | Ticket Number | | | | |
|---|---|---|---|---|---|---|---|---|
| Service | Code | Description | | | Units | Fee | Insurance | Patient |
| | | | **Visit Total/Balance Due** | | | | *$2,470.85* | *$0.00* |
| 01/27/2020 | SpineCenterAtlanta South | Forte NP-C, Sharonda | SCA South - Forest Park | 306124 | | | | |
| | M51.36 | Other intervertebral disc degeneration, lumbar region | | | | | | |
| | M48.04 | Spinal stenosis, thoracic region | | | | | | |
| | M48.08 | Spinal stenosis, sacral and sacrococcygeal region | | | | | | |
| 01/27/2020 | 99214 | Detailed Office Visit 25 min | | | 1.00 | $650.00 | $650.00 | $0.00 |
| | | | **Visit Total/Balance Due** | | | | *$650.00* | *$0.00* |
| 03/06/2020 | SpineCenterAtlanta South | Forte NP-C, Sharonda | SCA South - Forest Park | 311373 | | | | |
| | M62.40 | Contracture of muscle, unspecified site | | | | | | |
| | M50.30 | Other cervical disc degeneration, unspecified cervical region | | | | | | |
| 03/06/2020 | 99214 | Detailed Office Visit 25 min | | | 1.00 | $650.00 | $650.00 | $0.00 |
| | | | **Visit Total/Balance Due** | | | | *$650.00* | *$0.00* |
| 03/18/2020 | Orthopaedic & Spine Surgery of Atlant | Chappuis MD, FACS, James L | Orthopaedic & Spine Surgery of Atlanta | 312651 | | | | |
| | M54.5 | Low back pain | | | | | | |
| | M51.26 | Other intervertebral disc displacement, lumbar region | | | | | | |
| 03/18/2020 | 99214 | Detailed Office Visit 25 min | | | 1.00 | $650.00 | $650.00 | $0.00 |
| | | | **Visit Total/Balance Due** | | | | *$650.00* | *$0.00* |
| 03/23/2020 | Orthopaedic & Spine Surgery of Atlant | Adams MD, Brian D | Atlanta Orthopaedic Surgery Center | 312988 | | | | |
| | M54.15 | Radiculopathy, thoracolumbar region | | | | | | |
| 03/23/2020 | 62323 | Injection(s), of diagnostic or therapeutic substance(s) (eg, anesthetic, antispasmodic, opioid, steroid, other solution), not including neurolytic substances, including needle or catheter placement, interlaminar epidural or subarachnoid, lumbar or sacral | | | 1.00 | $2,309.82 | $2,309.82 | $0.00 |
| | | | **Visit Total/Balance Due** | | | | *$2,309.82* | *$0.00* |
| 03/23/2020 | Atlanta Orthopaedic Surg Center | Adams MD, Brian D | Atlanta Orthopaedic Surgery Center | 313650 | | | | |
| | M54.15 | Radiculopathy, thoracolumbar region | | | | | | |
| 03/23/2020 | 62323 | Injection(s), of diagnostic or therapeutic substance(s) (eg, anesthetic, antispasmodic, opioid, steroid, other solution), not including neurolytic substances, including needle or catheter placement, interlaminar epidural or subarachnoid, lumbar or sacral | | | 1.00 | $3,256.85 | $3,256.85 | $0.00 |
| | | | **Visit Total/Balance Due** | | | | *$3,256.85* | *$0.00* |
| 03/23/2020 | Orthopaedic & Spine Surgery of Atlant | Pham MD, Ngan | Atlanta Orthopaedic Surgery Center | 313651 | | | | |
| | M54.15 | Radiculopathy, thoracolumbar region | | | | | | |
| 03/23/2020 | 01992 | Anesthesia for diagnostic or therapeutic nerve blocks and injections (when block or injection is performed by a different provider); prone position | | | 1.00 | $630.00 | $630.00 | $0.00 |
| | | | **Visit Total/Balance Due** | | | | *$630.00* | *$0.00* |
| 04/15/2020 | Orthopaedic & Spine Surgery of Atlant | Chappuis MD, FACS, James L | Orthopaedic & Spine Surgery of Atlanta | 314117 | | | | |
| | M50.20 | Other cervical disc displacement, unspecified cervical region | | | | | | |
| 04/15/2020 | 99422 | Online digital evaluation and management service, for an established patient, for up to 7 days, cumulative time during the 7 days; 11-20 minutes | | | 1.00 | $231.74 | $231.74 | $0.00 |
| | | | **Visit Total/Balance Due** | | | | *$231.74* | *$0.00* |
| 05/21/2020 | Orthopaedic & Spine Surgery of Atlant | Adams MD, Brian D | Orthopaedic & Spine Surgery of Atlanta | 316545 | | | | |
| | M54.15 | Radiculopathy, thoracolumbar region | | | | | | |
| 05/21/2020 | 99214 | Detailed Office Visit 25 min | | | 1.00 | $650.00 | $650.00 | $0.00 |
| | | | **Visit Total/Balance Due** | | | | *$650.00* | *$0.00* |
| 06/01/2020 | Orthopaedic & Spine Surgery of Atlant | Adams MD, Brian D | Atlanta Orthopaedic Surgery Center | 317101 | | | | |
| | M54.15 | Radiculopathy, thoracolumbar region | | | | | | |
| 06/01/2020 | 63650 | Percutaneous implantation of neurostimulator electrode array | | | 1.00 | $24,919.01 | $24,919.01 | $0.00 |
| 06/01/2020 | A9150 | Nonprescription drug/Biofreeze | | | 1.00 | $25.00 | $25.00 | $0.00 |
| | | | **Visit Total/Balance Due** | | | | *$24,944.01* | *$0.00* |

---

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|

Patient ID:  
Birthdate:  
Phone 1:  
Phone 2:  

Steven Lowe  
525 Lake Court Drive  
Mcdonough GA  30523  

Total Charges: $203,029.56  
Total Payments: $0.00  
Total Adjustments: $0.00  
Insurance Balance: $203,029.56  
Patient Balance: $0.00  

| Visit / Service | Company / Code | Provider / Description | Facility | Ticket Number | Units | Fee | Insurance | Patient |
|---|---|---|---|---|---|---|---|---|
| 06/01/2020 | Atlanta Orthopaedic Surg Center | Adams MD, Brian D | Atlanta Orthopaedic Surgery Center | 317650 | | | | |
| | M54.15 | Radiculopathy, thoracolumbar region | | | | | | |
| 06/01/2020 | 63650 | Percutaneous implantation of neurostimulator electrode array | | | 1.00 | $23,423.86 | $23,423.86 | $0.00 |
| 06/01/2020 | A9150 | Nonprescription drug/Biofreeze | | | 1.00 | $25.00 | $25.00 | $0.00 |
| | | | Visit Total/Balance Due | | | | $23,448.86 | $0.00 |
| 06/01/2020 | Orthopaedic & Spine Surgery of Atlant | Pham MD, Ngan | Atlanta Orthopaedic Surgery Center | 317651 | | | | |
| | M54.15 | Radiculopathy, thoracolumbar region | | | | | | |
| 06/01/2020 | 01992 | Anesthesia for diagnostic or therapeutic nerve blocks and injections (when block or injection is performed by a different provider); prone position | | | 1.00 | $630.00 | $630.00 | $0.00 |
| | | | Visit Total/Balance Due | | | | $630.00 | $0.00 |
| 06/09/2020 | Orthopaedic & Spine Surgery of Atlant | Adams MD, Brian D | Orthopaedic & Spine Surgery of Atlanta | 317891 | | | | |
| | M51.26 | Other intervertebral disc displacement, lumbar region | | | | | | |
| | M54.15 | Radiculopathy, thoracolumbar region | | | | | | |
| 06/09/2020 | 99212 | Straightforward Office Visit 10 min | | | 1.00 | $450.00 | $450.00 | $0.00 |
| | | | Visit Total/Balance Due | | | | $450.00 | $0.00 |
| 08/03/2020 | Orthopaedic & Spine Surgery of Atlant | Adams MD, Brian D | Atlanta Orthopaedic Surgery Center | 322087 | | | | |
| | M51.9 | Unspecified thoracic, thoracolumbar and lumbosacral intervertebral disc disorder | | | | | | |
| | M54.15 | Radiculopathy, thoracolumbar region | | | | | | |
| 08/03/2020 | 63685 | Placement of spinal neurosstim pulse generator or receiver, direct or inductive coupling | | | 1.00 | $5,874.11 | $5,874.11 | $0.00 |
| 08/03/2020 | 63650 | Percutaneous implantation of neurostimulator electrode array | | | 2.00 | $33,225.34 | $33,225.34 | $0.00 |
| | | | Visit Total/Balance Due | | | | $39,099.45 | $0.00 |
| 08/03/2020 | Atlanta Orthopaedic Surg Center | Adams MD, Brian D | Atlanta Orthopaedic Surgery Center | 323262 | | | | |
| | M51.9 | Unspecified thoracic, thoracolumbar and lumbosacral intervertebral disc disorder | | | | | | |
| | M54.15 | Radiculopathy, thoracolumbar region | | | | | | |
| 08/03/2020 | 63650 | Percutaneous implantation of neurostimulator electrode array | | | 2.00 | $46,847.72 | $46,847.72 | $0.00 |
| 08/03/2020 | 63685 | Placement of spinal neurosstim pulse generator or receiver, direct or inductive coupling | | | 1.00 | $8,282.50 | $8,282.50 | $0.00 |
| | | | Visit Total/Balance Due | | | | $55,130.22 | $0.00 |
| 08/03/2020 | Orthopaedic & Spine Surgery of Atlant | Pham MD, Ngan | Atlanta Orthopaedic Surgery Center | 323263 | | | | |
| | M51.9 | Unspecified thoracic, thoracolumbar and lumbosacral intervertebral disc disorder | | | | | | |
| | M54.15 | Radiculopathy, thoracolumbar region | | | | | | |
| 08/03/2020 | 01992 | Anesthesia for diagnostic or therapeutic nerve blocks and injections (when block or injection is performed by a different provider); prone position | | | 1.00 | $630.00 | $630.00 | $0.00 |
| | | | Visit Total/Balance Due | | | | $630.00 | $0.00 |
| 08/11/2020 | Orthopaedic & Spine Surgery of Atlant | Adams MD, Brian D | Orthopaedic & Spine Surgery of Atlanta | 322787 | | | | |
| | M54.15 | Radiculopathy, thoracolumbar region | | | | | | |
| 08/11/2020 | 99215 | Complex Office Visit 40 min | | | 1.00 | $750.00 | $750.00 | $0.00 |
| | | | Visit Total/Balance Due | | | | $750.00 | $0.00 |
| 08/18/2020 | Orthopaedic & Spine Surgery of Atlant | Adams MD, Brian D | Orthopaedic & Spine Surgery of Atlanta | 323326 | | | | |
| | M51.36 | Other intervertebral disc degeneration, lumbar region | | | | | | |
| | M54.15 | Radiculopathy, thoracolumbar region | | | | | | |
| 08/18/2020 | 99213 | Expanded Office Visit 15 min | | | 1.00 | $550.00 | $550.00 | $0.00 |
| | | | Visit Total/Balance Due | | | | $550.00 | $0.00 |
| 09/15/2020 | Orthopaedic & Spine Surgery of Atlant | Adams MD, Brian D | Orthopaedic & Spine Surgery of Atlanta | 325775 | | | | |
| | M51.26 | Other intervertebral disc displacement, lumbar region | | | | | | |
| | M54.15 | Radiculopathy, thoracolumbar region | | | | | | |
| 09/15/2020 | 99213 | Expanded Office Visit 15 min | | | 1.00 | $550.00 | $550.00 | $0.00 |
| | | | Visit Total/Balance Due | | | | $550.00 | $0.00 |
| 09/29/2020 | Orthopaedic & Spine Surgery of Atlant | Adams MD, Brian D | Orthopaedic & Spine Surgery of Atlanta | 326977 | | | | |

10/19/2020   9:10 am  
Patient Ledger  
OSSA  
Page 5 of 6

| Patient ID: | | Steven Lowe | | | | | | |
| Birthdate: | | 525 Lake Court Drive | | | | | | |
| Phone 1: | | Mcdonough GA 30523 | | | | | | |
| Phone 2: | | | | | | | | |

Total Charges: $203,029.56
Total Payments: $0.00
Total Adjustments: $0.00
Insurance Balance: $203,029.56
Patient Balance: $0.00

| Visit | Company | Provider | Facility | Ticket Number | | | | |
|---|---|---|---|---|---|---|---|---|
| Service | Code | Description | | | Units | Fee | Insurance | Patient |
| | M51.26 | Other intervertebral disc displacement, lumbar region | | | | | | |
| | M54.15 | Radiculopathy, thoracolumbar region | | | | | | |
| 09/29/2020 | 99213 | Expanded Office Visit 15 min | | | 1.00 | $550.00 | $550.00 | $0.00 |
| 09/29/2020 | 72100 | Radiologic examination, spine, lumbosacral; two or three views | | | 1.00 | $199.10 | $199.10 | $0.00 |
| 09/29/2020 | 72070 | X-ray Thoracic, two views | | | 1.00 | $165.38 | $165.38 | $0.00 |
| | | | Visit Total/Balance Due | | | | $914.48 | $0.00 |
| | | | Selected Visit Totals | | | | $203,029.56 | $0.00 |